# ADAM ROBB v. CARNEGIE BROS. & CO.

### APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY.

Argued October 10, 1889.

Re-argued October 7, 1890—Decided October 5, 1891.

[To be reported.]

1. While the owner of property is without legal redress for the effect upon its desirability and market value of the mere proximity of an undesirable business, yet, if the business be so conducted as to affect the use of his property or the health of its occupants, these tangible and substantial injuries, capable of measurement by a pecuniary standard, will sustain an action for damages.

2. Whether, under the doctrine of Penna. Coal Co. v. Sanderson, 113 Pa. 126, one who mines coal, petroleum, or lead upon his own land, has the right, by virtue of that fact alone, to manufacture or refine such product upon the same land, without responsibility for injurious effects of the manufacture upon the lands of his neighbors, in the absence of negligence or malice, not decided.

3. At all events, one who is engaged in manufacturing coke from coal not mined by himself, but purchased at mines of other persons, remote from the land on which the manufacturing is done, will be liable in damages for a substantial injury to the crops and soil of an adjoining farm, caused by the smoke and vapors emitted from his ovens as a necessary incident of their operation.

4. While such a business, conducted in a careful manner upon an appropriate site, will not be enjoined by equity: Huckenstine's App., 70 Pa. 102, one who is substantially injured thereby is entitled to redress at law. The interests in conflict in such a case being those of private owners, standing on equal ground, the rule of Penna. R. Co. v. Lippincott, 116 Pa. 472, has no application.*

5. The measure of damages for such an injury to crops, is the actual loss of crops; and for any permanent impairment of productiveness of the soil, the extent of the loss resulting therefrom in the value of the farm. The character of the testimony by which such damages should be shown, discussed, per Mr. Justice WILLIAMS; the rule as to damages in case of a taking by eminent domain being inapplicable.

6 Upon the trial of an action for such injuries, a witness was asked to state "the amount of damages done to this property by reason of these ovens being built as they are, and the smoke from them," between certain dates. The question should have been excluded, because it

---

* See Lentz v. Carnegie Bros. & Co., post 612.

called for no fact, but for a lumping estimate which opened the way for the consideration by the witness of improper elements of damage.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 191 October Term 1889, Sup. Ct.; court below, No. 344 May Term 1887, C. P.

On March 30, 1887, Adam Robb brought trespass on the case against Carnegie Brothers & Co., Limited, to recover damages for injuries to the plaintiff's land, arising from the operation of certain coke ovens by the defendants. The defendants pleaded not guilty and the statute of limitations.

At the trial, on March 11, 1889, the following facts were shown, on the part of the plaintiff:

In 1886, the plaintiff purchased eighty-two acres of land in North Huntingdon township, Westmoreland county, for $4,000, and on September 22, 1877, an adjoining tract containing twenty-two acres, for $2,000. The two tracts were thereafter treated as one farm. This farm was situated north of the Pennsylvania railroad, about one half mile west of the village of Larimer, and about twenty miles east of Pittsburgh. Its nearest property line to the railroad ran along a high bluff and was distant about fifty rods from the railroad. Its soil was in part black loam and in part limestone soil.

Between the plaintiff's land and the railroad was a low piece of ground, of little value for ordinary purposes, upon which in 1871 the defendants, having become the owners thereof, erected coke ovens. Additional ovens were erected in 1879, and again in 1885 or 1886, bringing the total number up to about three hundred. The plaintiff assisted in building a part of the ovens by doing some hauling for the contractor who erected them. The coke manufactured by the defendants was made from coal slack or refuse, brought to their premises by rail from mines at a distance, none of it being mined from the land on which the ovens stood. In the course of such manufacture, large volumes of smoke and vapor were emitted from the defendants' ovens and carried to the plaintiff's land. In consequence of this, as the testimony for the plaintiff tended to show, his timber trees and many of his fruit trees were killed,

and the productiveness of the greater part of his land was gradually diminished to the point of almost total destruction. These injuries were confined principally to the tract of eighty-two acres, down to the time of the trial. For two of the six years preceding the bringing of the action the farm was leased to a tenant for a money rent. The occupancy of the plaintiff's dwelling was rendered less comfortable by reason of the smoke and vapors carried to it by the winds.

William Robb, a son of the plaintiff, testified on his behalf as follows :

" Q. Up till what time did this land produce good crops ? "

The question is objected to by defendants' counsel, for the reason that the plaintiff cannot recover, nor give in evidence, except within six years prior to the date of bringing suit.

By the court : Objection overruled ; exception.[1]

" Q. Up till what time did this land produce good crops ? A. Till 1871. . . . . Q. What is the effect of the building of these ovens upon the production of your farm ? A. Well, it is destroying the vegetation. Q. Well, how does it affect the crops ? A. Well, the crop, after we put it in, is produced through the earth. After it comes up, it just seems to dry and wither away ; don't never amount to anything ; don't yield ; wont fill out, nor be as it should be ; and then, what little is there, it is that black and smutty that a person that is working in it would look more like a miner coming out of the pit than anything else that I could represent to you. . . . . . Q. State to the court and jury what if any is the amount of damages done to this property by reason of these ovens being built as they are, and the smoke from them, from the thirtieth of March, 1881, to the thirtieth of March, 1887 ? " ·

To this question counsel for defendants object, for the reason that the question will elicit from the witness the injury done to the property, without distinguishing or specifying how or to what part of the property. It therefore tends to obtain a lapping over or doubling up of the damages. The question is therefore improper and should be overruled, unless the plaintiff distinguishes to what part of the property and in what way the injury is done. They object further because the charge against the defendants by the plaintiff is not for the taking of the land, but for injury done to plaintiff's land by the defend-

Statement of Facts.

ants. The ovens being on defendants' own land, the building of them there is no offence whatever.

By the court: Objection overruled; exception.[2]

" Q. What is the amount of damage that has been done to your father's property; answer the question that I asked you? A. Well, I would place it at ten thousand dollars."

The witness having stated, on cross-examination, that the market value of the plaintiff's farm in 1881 was from $150 to $200 an acre, was asked, upon re-direct examination:

" Q. If that farm would have sold for $150 or $200 an acre, whatever it may have been, in 1881, what would it have sold for now as affected by these ovens, before this suit was brought, two years ago; what would it bring in the market, affected by the ovens? A. Well, to the best of my knowledge, it would not bring more than twenty-five or thirty dollars an acre; it might be of some use; it might have for other purposes, but it would not for farming purposes."

Defendants' counsel object to this evidence as improper.

By the court: Objection overruled; exception.[3]

" Q. In your estimate of damages, you speak about the soil; now state what damage, if any, this smoke has done to the soil; not to the crops, but to the soil of the farm?"

This question is objected to by defendants' counsel, for the reason that it is part of the examination in chief, and is no answer to the cross-examination.

By the court: Objection overruled; exception.[4]

" A. Well, to the best of my knowledge and from my experience and looking at it, it puts a kind of black crust on the soil just about that thick that you can just break it off; and it dries up the top of the soil, it dries up and cracks; you can lift the cinders on top; it is about that thick; just about half an inch. Q. State whether or not that is poisonous to the soil, and prevents vegetation from becoming mature?"

Objected to, because it is part of the examination in chief, and is not proper in answer to the cross-examination.

By the court: Objection overruled; exception.[5]

" A. To the best of my knowledge it does."

Charles McCarthy, a witness for the plaintiff, testified as follows:

" Q. From 1881 to 1887, what, in your judgment, would this

Statement of Facts.

farm have rented for, if it had not been affected by the smoke from these ovens? A. Well, in 1881, I judge it would have been worth about $350 a year. Q. During all that time, without being affected by the smoke,—suppose that smoke had not gone over it as it has; suppose there had been no ovens there; how much would it have rented for during that period? A. Well, about $350; that is, by the year."

Defendants' counsel object to the question and answer of the witness, for the reason that the question is too vague, indefinite and uncertain.

By the court: Objection overruled; exception.[6]

The witness being cross-examined as to the sources from which the supply of slack, manufactured into coke by the defendants, came, was asked on re-direct examination:

" Q. The counsel asked you about this slack: about the uses that it had been brought there for; I want to know where they get this slack; I do not mean the mines, but where does it come from, in what part of the mine is it mined; is it slack that would be thrown away? I want to ask whether the men who mine the slack get paid for it.—This for the purpose of showing by this witness that this is simply refuse stuff that nobody wants, that they gather up about the mines owned by other companies, and bring it there and manufacture it into coke; for the purpose of answering the cross-examination as to the public benefit that is derived from this."

To which question, counsel for the defendants say that it is irrelevant, improper and impertinent to the issue; that the counsel themselves have proven that the slack was refuse; and now, to show that they did not pay anything for the digging of it would be utterly outside of the issue and no answer to the cross-examination.

By the court: Offer admitted; exception.[7]

" Q. What do you know about this slack being brought there and from what mines; you say from Manor and Irwin and other places? A. Well, I cannot tell exactly, but I know it comes to their coke works from other works, and I seen the cars in the different mines. Q. What do you know about the kind of material; that is, with regard to the mining of it; what do the owners of the mines do with that material? A. Well, in former times they used to dump it out; now they

sell it.  Q. What do you know, if anything, about what they pay for it ?  A. No, sir; I do not know anything about that. Q. What do you know, if anything, about what the miners receive for mining that stuff?  A. They get nothing."

George Rehling testified for the plaintiff on direct examination: " Q. When did you say you last saw the vegetation ? A. In 1887.  Q. What condition was the vegetation in, when you last saw it in 1887 ?—This question is asked for the purpose of showing the condition of the vegetation at the last time the witness saw it, or was upon the ground; not for the purpose of fixing damages; simply for the purpose of showing the actual state of facts as they existed at that time."

If the last time the witness saw this land was after March 30, 1887, this question is objected to by defendants' counsel as incompetent, for the reason that no notice has been given that the plaintiff expects to claim damages to the present time; and evidence of the condition of the farm since the date of the suit can only be for the purpose of proving damages, and is therefore incompetent and irrelevant.

By the court: We think the offer competent for the purpose, not of establishing damages after suit brought, but to inform the jury, as far as the offer may, the effect of the gases upon the land; the objection is therefore overruled; exception.[8]

" A. It was in very poor condition."

John Nehrig, Jr., called for plaintiff, was asked:

" Q. How would this farm be for producing fruit, in your judgment, leaving the smoke out of the question?—This question is asked for the purpose of showing that the soil is suitable for planting and maintaining an orchard and growing fruit?"

The question is objected to by defendants' counsel as incompetent, because it is too general and vague, and not calculated to prove any damages sustained by the plaintiff; the fact being that an orchard is planted on this farm and testimony admitted already, as to the condition of these trees and their fruit-bearing qualities.

By the court: Objection overruled; exception.[9]

" A. I think the farm would be right enough to raise fruit on ; I think the soil is good enough ; I have seen trees planted in worse places than that and growing."

Charge of Court below.

Testimony for the defendants tended to show that the site of their works, while secluded and remote from any dense population, was centrally located with reference to the coal mines in the surrounding region, and thus peculiarly adapted for the manufacture of coke from the product of those mines; that their works cost the defendants nearly $200,000, and gave employment to large numbers of laborers; that the effect of their operations upon the plaintiff's land was exaggerated in the testimony for the plaintiff; that the plaintiff got reasonably fair crops, and as good as could be expected for the degree of attention he gave to his farm, he being engaged in mining and selling coal from his land for domestic use in the neighborhood; and that a chemical analysis of the soil of said farm exhibited a lack of many of the ingredients requisite to render it productive.

The testimony being closed, the court, HUNTER, P. J., after submitting to the jury the questions of fact arising upon the testimony, charged further in part as follows:

We turn now to the law of the case, which is for the court, and about which there is very serious contention; the least of which is the period of time over which the injury has been done, if any injury has been done at all. This is a personal action for damages to plaintiff's property, and the law limits the time in which action may be brought, or recovery had, to six years. . . . . The summons was procured on the thirtieth of March, 1887. Counting six years back, the time would be the thirtieth of March, 1881. Between these dates only, can there be a recovery for damages, if the plaintiff has sustained any damages at the hands of the defendants. You will be careful in this regard. If the trees were killed, and soil and crops injured by the defendant company before March 30, 1881, and after March 30, 1887, this action cannot operate to give the plaintiff redress for that.

We now approach a very serious question of law that has been raised during the progress of the trial, and argued at the close of the testimony with marked ability by counsel on both sides. We have examined to the extent of our ability the exhaustive and learned opinions of our Supreme Court on the questions raised in this case. We might read from these opin-

ions, but that might have a tendency rather to confuse you. Many of the cases which have been commented upon, refer particularly to the rights of riparian owners; that is, the right to use a stream of water where nature has placed it, so that neither the owner of the land below nor the owner of the land above shall so interfere with the stream as to do injury to the one or to the other. But the law as of old may not be the law of the present, because things have changed, and nature's wealth is now being so developed for the general good; and one neighbor may do injury to another, as for instance in the necessary development of his coal lands, by polluting a stream of water which was valuable to his neighbor below, and this injury be without remedy. Again, where a railroad is being operated, and the noise of the train and the smoke from the locomotive, becomes injurious and offensive to the owners of property and residents along the line of the road, while it may be an injury, yet it would be without remedy because of its necessity for the general public good.

The evidence in this case, however, develops the fact that the defendants are not operating their own coal lands, but are bringing material, coal slack, upon their land, and manufacturing the same into coke, for their own use at Braddock, at the Edgar Thompson Steel Works.

[It is true that they may have selected a place where the least possible harm would be done to others, so that a court of equity would not interfere to restrain them; but, if they do actual positive harm by bringing material upon the land, and manufacturing it adjacent to plaintiff's land, to the injury of the same, are they not responsible? We say, actual, positive, serious injury. If they do so, we are of opinion that they are responsible, and answerable for such damages done. After much thought we have arrived at these conclusions:

1. That the owners of coal lands may develop and operate the same, even to the injury of adjoining landowners, without remedy upon the part of the latter, unless malice or negligence be shown.

2. That a court of equity will not restrain the operation of works of an injurious nature, where the best possible place, to do the least injury to others, has been selected.

3. That, while equity will not restrain, law will give a remedy,

where actual, positive, serious harm has been done to another, by bringing upon adjacent land and manufacturing material not part of the land, whether such harm be to health or to property.] [12]

The law touching these questions has been raised by propositions submitted by counsel, which will be presently answered. You will then consider, first, have the defendants, by the operation of their works, within six years from March 30, 1887, the date of bringing suit, done injury to plaintiff's trees, to the soil, and to the crops, during that time, less two years when the premises were rented, and if so, to what amount? The damages, if any, can only be compensatory. . . . . .

The plaintiff requests the court to charge:

1. If the jury believe from the evidence that the timber trees and fruit trees growing upon the plaintiff's land have been injured or destroyed by the smoke and gases from the defendants' coke ovens, the plaintiff will be entitled to your verdict for such an amount as will compensate him for the damages sustained by him during six years prior to the time suit was brought in this case.

Answer: This point is affirmed.[15]

2. If the jury believe from the evidence that the crops growing upon the lands of the plaintiff have been injured or destroyed by reason of the smoke and gases from the defendants' coke ovens, the plaintiff is entitled to your verdict for such damages as will compensate him for the loss of or injury to his crops during six years prior to the time when this suit was brought.

Answer: The plaintiff will be entitled to compensation for injury to crops for four years only, if an injury has been done them, because he leased the farm for a money rental for two years during the period of six years.[16]

3. If the jury believe from the evidence that the soil of the plaintiff's farm has been injured or destroyed by reason of the smoke or gases from the defendants' coke ovens, the plaintiff is entitled to your verdict for such damages as would compensate him for the injury done to his soil during six years prior to the time this suit was brought.

Answer: This point is affirmed.[17]

4. The plaintiff is entitled to your verdict for such an amount

as will compensate him for all the damages which he has sustained by reason of the smoke from the defendants' coke ovens passing over his farm from March 30, 1881, to March 30, 1887.

Answer: Whether the smoke did actual, positive damage, is a question of fact for you. If you find the fact so to be, then the plaintiff should be compensated as stated in the point.[18]

5. In making up your verdict you will disregard all testimony on the part of the defendants going to show that the making of coke by the defendants is useful or beneficial to the community, or that the construction of the defendants' coke works has increased the value of the plaintiff's property or other property in that vicinity, by bringing a larger number of workmen into the neighborhood.

Answer: We cannot see our way clear so to instruct you. The harm and the benefit may be considered together. If special benefit resulted to the plaintiff in any way from the construction of the ovens, there is no reason why the same may not be considered. The general benefit, however, or the benefit to the plaintiff in common with others, may not be considered.[19]

Defendants request the court to charge :

3. The defendants are engaged in a lawful business, and if you believe they have selected a judicious location therefor, the plaintiff cannot recover in this action unless he has satisfactorily shown that the defendants have operated their works with negligence, unskilfulness, or malice.

Answer: This point is refused.[20]

4. The manufacture of coke from coal is an independent industry, and as such may be lawfully carried on in a different location from that where the coal is mined. If you believe the defendants have chosen a secluded place for the erection of their ovens, where as few persons may be inconvenienced as possible, then we instruct you that the injuries resulting from their operation are damnum absque injuria, and your verdict must be for the defendants.

Answer: The first branch of this proposition is affirmed; the second is refused.[21]

5. Defendants being engaged in a line of business of great public interest, and employing many men in the prosecution of their works; having selected a location far distant from a

Arguments.

densely populated community, and one best adapted for their operations, they are not liable for the injuries to plaintiff's land which are the result merely of the subsequent prosecution of their works in a lawful manner, without negligence, unskilfulness, or malice.

Answer: We decline this proposition. While, in equity, the defendant would not be restrained, under such circumstances, yet, if they establish their works contiguous to the lands of their neighbor, and bring material thereon, and manufacture it, to the serious, positive injury of their neighbor's land, we cannot say that they are not responsible at law. This is not a case of where the owners of coal lands are developing the same.[22]

6. From all the evidence in this case, we instruct you as matter of law that your verdict must be in favor of the defendants.

Answer: This point is refused.[23]

—The jury returned a verdict for the plaintiff for $4,798.10. A rule for a new trial having been discharged and judgment entered, the defendants took this appeal, assigning for error:

1-9. The admission of plaintiff's offers.[1 to 9]

12. The part of the charge embraced in [ ] [12]

15-19. The answers to plaintiff's points.[15 to 19]

20-23. The answers to defendants' points.[20 to 23]

*Mr. J. F. Wentling* and *Mr. Paul H. Gaither* (with them *Mr. J. A. Marchand* and *Mr. D. A. Miller*), for the appellants:

1. The affirmance of this judgment will seriously cripple the immense coking interests of southwestern Pennsylvania. We submit that the preponderating business interests of certain sections of the country should in a large measure control the application of different principles of law relative to the ownership and use of property. The manufacture of coal into coke, in the immediate region where it is found and where this is the dominant business interest, should not be regarded as a nuisance, even though it would be such in the thickly settled portions of the agricultural regions of southeastern Pennsylvania; and, in the region first mentioned, the manufacturer should be responsible for inconveniences resulting from his trade only when it is accompanied with unskilfulness, negli-

gence, or malice.   In support of this view we refer to Huckenstine's App., 70 Pa. 106 ; Penna. Coal Co. v. Sanderson, 113 Pa. 144 ; Richards's App., 57 Pa. 113.

2. The court below refused to apply the doctrine of damnum absque injuria in this case, for the reason that the coal used by the defendants was not mined from their own land.   We have two complaints to make of this ruling : (*a*) We doubt its correctness, as an inflexible rule, that the owner of coal lands can with impunity set up coke ovens anywhere on his land and there burn his coal into coke.   If we read the decisions correctly, it is his duty to take the coal to a secluded place, to burn it ; but, having done so, he is not liable for the slight inconveniences resulting from his lawful operations.   (*b*) The doctrine that coal cannot be burned into coke anywhere except on the land which produced it, without full responsibility for all the consequences, is erroneous.   It would produce strange confusions if such were the law, for it would logically follow that every substance taken from the earth must be converted into the manufactured article on the land where it is found.

3. In fact, all coal burned in the coke regions is brought upon the land occupied by the ovens, and we fail to see the difference between hauling it to the ovens two or three miles underground, and hauling it that distance upon the surface. The mining of coal and the manufacture of coke are two distinct industries.   For damages necessarily resulting from the former, the operator is relieved from liability : Penna. Coal Co. v. Sanderson, 113 Pa. 144.   Why should not the operator of coke works be likewise relieved ?   See Penna. R. Co. v. Marchant, 119 Pa. 560 ; Penna. etc. R. Co. v. Walsh, 124 Pa. 544. It is fully established by the testimony on both sides, in this case, that the defendants selected an isolated and secluded place for the location of their works, and have operated them without unskilfulness, negligence, or malice, and the law laid down in the cases just cited should relieve them from this claim for damages.   It is unnecessary to do more than merely refer to the errors in the admission of testimony, pointed out by the seventh and eighth assignments.

*Mr. George Shiras, Jr., Mr. W. F. McCook, Mr. P. C. Knox,* and *Mr. James H. Reed,* for other coke companies interested in

the questions involved, filed a brief containing an argument
for the appellants, citing Phila. etc. R. Co. v. Yeiser, 8 Pa.
366; Shrunk v. Navigation Co., 14 S. & R. 71; Penna. R. Co.
v. Lippincott, 116 Pa. 472; Edmundson v. Railroad Co., 111
Pa. 316; Huckenstine's App., 70 Pa. 102; Penna. Coal Co.
v. Sanderson, 113 Pa. 126 (s. c. 86 Pa. 401); distinguishing
Penna. Lead Co.'s App., 96 Pa. 127.

*Mr. D. S. Atkinson* and *Mr. J. M. Peoples*, for the appellee.

1. We have no quarrel with the authorities cited by the de-
fendants' counsel, but in our judgment there is a well-defined
distinction between their facts and the case at bar.    The argu-
ment based upon the amount of money invested in the coke
plant is fully answered by the opinion in Penna. Lead Co.'s
App., 96 Pa. 127.    Undoubtedly, the defendants were entitled
to the natural use and enjoyment of their land, but we deny
that any principle of law justifies them in erecting three hun-
dred coke ovens on it and manufacturing into coke slack from
the mines of other persons in the surrounding neighborhood, if
by such manufacture injury is worked to an adjacent landown-
er.    They may be engaged in a lawful and important business,
but so is the plaintiff.    What principle of law or equity allows
one great industry of the country to flourish at the expense of
another?

2. While the principles laid down in Penna. Coal Co. v.
Sanderson, 113 Pa. 126, do not rule this case, any part of the
opinion that is applicable to the present case is in harmony
with the position assumed by the court below.    The poisonous
gases which injured the plaintiff were not the natural product
of the defendants' land, but came from materials which they
brought thereon.    The principle of Fletcher v. Rylands, L. R.
1 Exch. 280, is applicable.    We admit that the defendants are
not liable for trifling injuries not caused by negligence, unskil-
fulness, or malice, but for a real, substantial injury to the plaint-
iff's land, produced by the smoke and vapor from their coke
works, they are responsible in an action at law: Brown v. Tor-
rence, 88 Pa. 186; Price v. Grantz, 118 Pa. 402; Richards's
App., 57 Pa. 105; Huckenstine's App., 70 Pa. 102; Penna.
Lead Co.'s App., 96 Pa. 116; Penna. etc. R. Co. v. Walsh,
124 Pa. 544.    Moreover, the toleration of this nuisance is not

necessary to the successful carrying on of the coke industry. Within five minutes' ride of the court house, in this city, is the coke plant of Jones & Laughlin, where it is entirely obviated by conducting the smoke and gases into a tall chimney. Why should not the defendants be required to do the same ?

OPINION, Mr. JUSTICE WILLIAMS:

This case was tried with considerable care in the court below, and was in most respects well tried. Some questions, however, were raised and considered on the trial which were not necessarily involved, and which hindered, rather than helped the court and jury in reaching a correct result. For this reason, and because the case as it is presented is one of considerable general importance, it seems desirable that the position of the parties, and the principles by which their relative rights are to be adjusted, should be briefly considered. This may be done by answering the following questions :

1. Has the plaintiff shown a cause of action for which he can recover in a court of law ?

2. If he has, what is the measure of his damages ?

3. Was the evidence, which was admitted under objection, relevant to the issue before the jury ?

The plaintiff shows that prior to 1871 he was the owner of a farm in Westmoreland county on the uplands north of Brush creek. His cultivated fields began about one thousand feet from, and about three hundred feet above the stream, and extended back to and beyond his dwelling and farm buildings, which were about one half mile from the stream. He shows that in 1871 the defendants bought a tract of land in the valley, and extending up the slope some three or four hundred feet, on which they erected coke ovens on the flat on the north side of the creek. He alleges that the smoke and gas from these ovens passed over his farm, injuring thereby his crops, diminishing the productiveness of the soil, and the desirability of his house as a place of residence. Evidence was given on the trial in support of this allegation. The defendants deny that the plaintiff has suffered injury in his crops, his soil, or the comfort of his home ; and they further deny that the injuries alleged, if actually sustained, would entitle the plaintiff to recover, and for this they give the following reasons :

(*a*) Such injuries are the natural and necessary result of the development by the owner of the resources of his own land, as in Penna. Coal Co. v. Sanderson, 113 Pa. 126 ; (*b*) they result from a reasonable use of his own land for a lawful purpose, as in Huckenstine's App., 70 Pa. 102 ; (*c*) they result from the pursuit of a lawful calling, in a lawful manner, without either negligence or malice on the part of the owner or his employees, as in Penna. R. Co. v. Lippincott, 116 Pa. 472.

In Sanderson's case the land of the coal company was coal land. Its value could be realized by the owners in no other way than by bringing the coal to the surface, so that it could be prepared for the market. In the process of mining, subterranean veins of water are necessarily opened, and the water accumulating in the mines must be brought to the surface, where it naturally finds its way into the surface streams, and pollutes them. If this could not be done, a great industry would be interfered with, and the owner of the coal land denied the exercise of the rights of ownership on his land, for the benefit of a neighboring owner whose title was no greater or higher than his own. The maxim, sic utere tuo ut alienum non lædas, was therefore neither suspended nor modified in Sanderson's case. The coal company was using its own land in the only manner practicable to it. The harm done thereby to others was the least in amount consistent with the natural and lawful use of its own. If this use was to be denied to the coal company, because some injury or inconvenience to others was unavoidable, then the result would be practical confiscation of the coal lands for the benefit of householders living on lower ground. But the defendants are not developing the minerals in their land, or cultivating its surface. They have erected coke ovens upon it, and are engaged in the manufacture of coke. Their selection of this site, rather than some other, is due to its location and to their convenience, and has no relation to the character of the soil, or to the presence or absence of underlying minerals. The selection was no doubt a wise one, quite secluded, and quite convenient to the several mines from which the material was to be obtained for the making of coke ; but it was the selection of a manufacturing site, and is subject to the same considerations as though glass, or lumber, or iron had been the commodity to be produced, instead of coke. The rule in

Sanderson's case has therefore no application to the facts of this case. The injury, if any, resulting from the manufacture of coke at this site, is in no sense the natural and necessary consequence of the exercise of the legal right of the owner to develop the resources of his property, but is the consequence of his election to devote his land to the establishment of a particular sort of manufacturing, having no natural connection with the soil or the subjacent strata.

The rule in Huckenstine's Appeal is equally inapplicable. The land of the appellant in that case had upon it a deposit of fine brick clay, which could be made into bricks with profit, if this was done near the pit from which the clay was taken. This is the usual, and probably a necessary way of converting the clay into bricks. An effort was made to enjoin against the burning of the bricks by Huckenstine on the field where the clay was obtained. The injunction was refused, and it was held that, upon the case as presented, Huckenstine was making a reasonable use of his own land, which equity would not interfere with. Whether he would have been liable in an action at law for any substantial injury he might do to a neighbor by the burning of bricks, was not before the court, and was not considered. We think it is true, as held by the judge of the court below, that the evidence in this case would not justify an injunction. It shows a selection of a site as well adapted to the business, and as remote from dwellings as any in that region. To enjoin the manufacture of coke, at such a site, would amount to a prohibition of its manufacture, and the destruction of vast allied and dependent industries of immense value to the public as well as to those directly engaged in them. An injunction is not of right, but of grace, and will never be issued by a court of equity when it will inflict a greater injury than it will prevent. In such a case, the injured party will be left to his redress at law. No more than this is fairly covered by Huckenstine's case. The plaintiff in this case is therefore in the right court, and if he is substantially hurt by the use to which the defendants have seen fit to devote their land, we see no reason why he may not recover, unless it is found in the last of the positions taken by the defendants, for which Lippincott's case is cited.

It is a fundamental principle of our system of government that the interest of the public is higher than that of the indi-

Opinion of the Court.

vidual, so that when these interests are in conflict the latter must give way. If the individual is thereby deprived of his property without fault on his part, he is entitled to compensation; but if he is affected only in his tastes, his personal comfort, or pleasure, or preferences, these he must surrender for the comfort and preferences of the many. Thus, highways are necessary to the public business and comfort. Some noise and dust are necessarily occasioned by the legitimate use of them. This may be disagreeable, perhaps in some cases positively harmful, to some one or more of the persons living along them; but for this there is no remedy, at law or in equity. It is one of the necessary consequences of subjecting the individual to the public, in those things as to which their interests are in conflict. Railroads have become the great highways of travel and commerce. The turnpike and canal have been superseded, and the people and their products are transported at a great advance in speed and comfort over the modern highway, by the power of steam. The law recognizes the public character of these highways. Their presence is necessary to the prosperity and comfort of the public. To some persons who live near them, as to some persons who live upon a busy city street, the incessant roar of business and the dust of passing vehicles or trains may be unpleasant or painful; but, whether such persons live upon a country road, a paved street, or a railroad, they are alike remediless. No action will lie against the municipality, the turnpike, or the railroad company for the noise and dust caused by the legitimate use or operation of the highway in either case. For negligence or malice the wrongdoer is liable to the party injured, but for the lawful use of the road, in the customary manner, no liability attaches to the traveler or owner. The railroads are built, as is the turnpike or the street, under laws regulating their construction and use in the interest of the public which is to be served by them. The right to operate railroads is a necessary incident to the right to build them, and this was held in Lippincott's case. But the production of iron, or steel, or glass, or coke, while of great public importance, stands on no different ground from any other branch of manufacturing, or from the cultivation of agricultural products. They are needed for use and consumption by the public, but they are the results of private enterprise, conducted for private profit and under

the absolute control of the producer.   He may increase his business at will, or diminish it.   He may transfer it to another person, or place, or state, or abandon it.   He may sell to whom he pleases, at such price as he pleases, or he may hoard his productions, and refuse to sell to any person or at any price. He is serving himself in his own way, and has no right to claim exemption from the natural consequences of his own act.   The interests in conflict in this case are therefore, not those of the public and of an individual, but those of two private owners who stand on equal ground as engaged in their own private business.   Lippincott's case is therefore no reply to the plaintiff's case.

What, then, is the measure of damages ?   The declaration charges an injury to the trees and crops growing on the surface, and a permanent injury to the soil, by the deposit upon it from the passing smoke and gas of sterilizing and poisonous substances.   To the first of these the statute of limitations was properly applied.   During two of the six years open to inquiry the farm was in the possession of a tenant who paid what is admitted to have been a full rent for it.   The crops for those two years should therefore be excluded from consideration.   As to the remaining four years, if the crops were so affected as to reduce their quantity or value, the shrinkage upon each year's crops should be shown in bushels or tons, or approximated as nearly as possible.   For, the acreage in wheat or corn in any one of these four years, for example, being shown, and the yield per acre, a comparison of the crop with that raised on the same farm before the ovens were built could be made, and, so far as the difference was shown to be due to the smoke or gas, it would afford some basis for an estimate of the damage sustained on that year's crops.   In this manner the actual injury to the crops, if any, could be gotten at pretty nearly.   As to a permanent injury to the soil by the deposit of injurious particles upon it, a chemical analysis will afford the only safe guide.   Differences in the amount of the crop might be due to the effect of the smoke on the growing plant, to negligent tillage, to exhaustion of the soil by long cropping, or to many other causes ; but if, as some of the witnesses have testified, a crust of foreign and sterilizing substances has been deposited over this farm varying from a quarter to a third of

an inch in thickness, specimens of it can and should be produced, and its composition and the effect of its presence ascertained and explained to the jury by those competent to speak on the subject. This is a question susceptible of a clear and satisfactory solution by the application of scientific tests which the court and jury should have the benefit of. If the result is to show a permanent injury to the soil which impairs its productiveness to an appreciable degree, the extent of the loss in the value of the farm can be readily computed. If such permanent impairment is not made to appear, this part of the plaintiff's claim should be rejected altogether. The fact that the plaintiff may regard his home as less desirable than before, because of the proximity of an undesirable business or of undesirable neighbors, or the further fact that its selling value has been reduced by reason of such proximity, affords no ground for a recovery. The location of a livery stable, a restaurant, a distillery, and many other kinds of business close to one's home might diminish its comfort and its market value, but the owner would be without legal redress, so far as the effect of mere proximity is concerned. If, however, the business was so conducted as to affect the use of adjoining property or the health of its occupants, these tangible and substantial injuries capable of measurement by a pecuniary standard might sustain an action for damages.

The ordinary rule for the ascertainment of damages, where land has been entered and appropriated under the right of eminent domain, does not furnish a measure of the plaintiff's right to recover in this case, for the reasons already given. Where an entry and seizure have been made, the effect of the seizure and appropriation of part of the land of the owner to a particular use is to be considered, as well as the value of what is taken. This can be best adjusted by ascertaining the selling value of the whole property before the entry, and after it has been made. The difference, if any, shows the actual loss which the owner has suffered. But, in this case, there has been no entry upon or appropriation of the plaintiff's land. What he alleges is that the prosecution of the business of making coke by the defendants on their own land has hurt his crops and injured his soil. They have the right to make coke. If the establishment of that business near the plaintiff affects

Opinion of the Court.

the selling value of his farm, he can no more recover for that than he could recover against the saloon-keeper or the livery-man because the location of their business near him had made his property unsalable. The nature of the business is therefore to be left out of view. The sole question is, what harm has been done to the ·plaintiff by, or as the direct result of the prosecution of the defendants' business at a place where they had a legal right to carry it on ? The plaintiff might honestly think, and his neighbors might be willing to testify, that the mere location of the ovens on adjoining land reduced the value of his farm thirty or fifty per cent or more, and a comparison by them of the value before and after the building of these ovens would include this element, for which there can be no recovery.

What has been now said substantially disposes of our question relating to the testimony objected to. The second assignment of error is sustained. The question objected to should have been excluded because it called for no fact, but for a lumping estimate which opened the way for the witness to introduce considerations that we have seen had no place in the adjustment of the damages. The question referred to in the third assignment should have been excluded for reasons already given. The seventh assignment is also sustained. It was of no sort of consequence where the defendants obtained the material which they used in making coke, or what price they paid for it, or what the miners who brought it to the surface were paid for mining it, and such questions should have been excluded. The ninth assignment must also be sustained. The question was, not what purposes the plaintiff might have devoted his farm to, and what damages he would have sustained in that case, but to what purposes had he devoted it, and to what extent had he been interfered with by the defendants' business. An examination of the evidence shows that the plaintiff purchased his farm, containing eighty-two acres, for four thousand dollars, a few years before the ovens were built. Several years after they were built he bought twenty acres adjoining, which contained coal which he mined and sold to the employees of the defendants. So far as the evidence indicates, the latter piece was not farmed, but kept and used for mining coal. For the injury to four years' crops, and for permanent injury to his

soil, the plaintiff recovered nearly one thousand dollars more than his farm proper cost him, and still finds it to his advantage to reside upon it and to cultivate it. The fact that such a verdict was rendered shows that the court and jury must have been misled to some extent by the irrelevant testimony, and by the improper measure of damages which the jury was thus left to apply.

It only remains to consider briefly the twelfth assignment of error. The learned judge said to the jury :

" After much thought, we have arrived at these conclusions : (1) That the owners of coal lands may develop and operate the same, even to the injury of adjoining landowners, without remedy on the part of the latter, unless malice or negligence be shown. (2) That a court of equity will not restrain the operation of works of an injurious nature where the best possible place to do the least injury to others has been selected. (3) That, while equity will not restrain, law will give a remedy where actual, positive, serious injury has been done to another, by bringing upon adjacent land and manufacturing material not part of the land, whether such harm be done to health or property."

We cannot see that the appellants were hurt by this instruction. The first proposition is no more than a statement of the rule which was held in Sanderson's case. The second is all that the appellants could ask, and, as a general rule, is well settled. If there is any error in the third, it is in the concession that the mine owner is under less obligation to his neighbors when he makes coke upon the tract from which the coal is mined, than when he makes it elsewhere. If this concession was mistaken, as perhaps it was, it did not lay any burden on the appellants, and they have no right to complain of it. Whether one who mines coal, or petroleum, or lead on his own land, has, by virtue of that fact alone, a right to manufacture or refine such product on the tract from which it was obtained, under circumstances which would prevent its manufacture, or render him liable for damages if he manufactured on some other tract, is a question not raised by the facts of this case. If the relation of the miner to his product, or the surface to the underlying minerals, could confer exemption from liability for the consequences of the manufacture of the

material mined, where the process was conducted on the same tract, the defendants were not within the range of such exemption. They did not mine the coal they used. It was not mined on the land upon which the coke ovens stood. They were therefore under the general rule, and not within the exemption, if such exemption really exists. At the same time, the location of these parties and the industries of the region are not to be lost sight of. The plaintiff's farm is in a region in which bituminous coal is obtained in large quantities. He himself mines coal upon his own land for sale. The conversion of coal into coke, to supply fuel for the great iron and steel mills of western Pennsylvania, is one of the great industries of the region. Many millions of money are invested in, and many thousands of men are employed about its production. It has been largely instrumental in the development, growth, and general prosperity of the region. The plaintiff shares the general benefits, and seems to possess some advantages that are special, and grow directly out of the establishment of these works near him; for he has been thereby provided with customers for his coal and his farm products at his own door. These considerations should be borne in mind in adjusting the damages, if any have been sustained; so that the plaintiff, while he recovers for his actual loss in the products of his farm or the destruction of his soil, as the evidence may show the facts to be, shall not be allowed exemplary damages; and so that the defendants shall not be treated as wrongdoers in the establishment of their plant on a well-selected and secluded tract of land belonging to themselves.

As this case goes back for a new trial, it is quite proper for us to add that the trial judge is, in an important sense, the thirteenth juror; and when the amount of the verdict shows that it must have been arrived at by the adoption of an erroneous measure of damages or a mistake in computation, he should not hesitate to set it aside.

> The judgment is reversed, and a venire facias de novo awarded.