**PRENTISS et al. v. NATIONAL AIR-LINES, Inc.**

**GIZZI et al. v. AMERICAN AIR-LINES, Inc.**

Civ. A. Nos. 758–52, 767–52.

United States District Court
D. New Jersey.

May 13, 1953.

Harry Wolf, Elizabeth, N. J., for plaintiffs Gizzi·et al.

Shanley, Congleton & Fisher, Newark, N. J., Richard J. Congleton, Newark, N. J., of counsel, for defendants National Airlines, Inc., et al.

Before MODARELLI and HARTSHORNE, District Judges.

HARTSHORNE, District Judge.

The crux of this case, or rather of the series of similar cases considered together by this Court, by agreement of counsel,[1] is the constitutionality of the material provisions of the New Jersey aviation statute. N.J.S.A. 6:2–7, as enacted in 1929, and re-enacted in 1946.[2]

As a result of the three airplane crashes December 16, 1951, January 22, 1952 and February 11, 1952, of planes owned by the American Airlines, the National Airlines and the Miami Airlines,[3] at Elizabeth, New Jersey, a large number of cases were brought against such companies in this Court, not only by passengers in such planes, but for injuries to, and the death of, persons, and damage to property, on the land where such planes crashed. To these latter actions, the defendants National Airlines and American Airlines set up a series of defenses, covering substantially act of God, lack of negligence, and negligence of a third party, i. e., improper directions from Federal Civil Aeronautics Authority as to course and elevation in take off and landing.

The above statute, so far as applicable, provides

"6:2–7. Liability for injuries to person or property; lien on aircraft; mortgagees, vendors and trustees not deemed owners.

"The owner of every aircraft which is operated over the land or waters of this

David Green, Newark, N. J., Abraham I. Harkavy, Newark, N. J., of counsel, for plaintiffs Prentiss et al.

1. Prentiss v. National Airlines, Inc. 758–52; Treat et al. v. National Airlines, Inc. 882–52; Jacobson et al. v. National Airlines, Inc. 943–52; Roemer et al v. National Airlines, Inc. 973–52; Jones et al. v. National Airlines, Inc. 1058–52; LoRocco et al. v. American Airlines, Inc. 217–52; Gizzi et al. v. American Airlines, Inc. 767–52; Tomaso et al. v. American Airlines, Inc. 880–52.

2. P.L.1929, chapter 311, page 721; P.L. 1946, chapter 237, page 849.

3. The Miami Airlines cases involved the claims of plane passengers only, and thus do not raise the question of the constitutionality of the statutory section here involved.

State is absolutely liable for injuries to persons or property on the land or water beneath, caused by ascent, descent, or flight of the aircraft, or the dropping or falling of any object therefrom, whether such owner was negligent or not, unless the injury is caused in whole or in part by the negligence of the person injured, or of the owner or bailee of the property injured. If the aircraft is leased at the time of the injury to person or property, both owner and lessee shall be liable, and they may be sued jointly, or either or both of them may be sued separately. An airman who is not the owner or lessee shall be liable only for the consequences of his own negligence. The injured person or owner or bailee of the injured property, shall have a lien on the aircraft causing the injury to the extent of the damage caused by the aircraft or object falling from it. A chattel mortgagee, conditional vendor or trustee under an equipment trust, of any aircraft, not in possession of such aircraft, shall not be deemed an owner within the provisions of this section. As amended L.1946, c. 237, p. 849, § 1."

As enacted in 1929, the above provisions were identic, save for the last sentence, presently immaterial, which was added in 1946. As enacted in 1929 it had first been promulgated by the National Conference of Commissioners on Uniform State Laws in 1922, as a proposed "Uniform State Law for Aeronautics", and adopted in whole or in part by upwards of twenty-four states, the particular provisions here in question having been adopted by at least ten states, including New Jersey. Nor is it material even as quasi legislative history, that, as defendants have noted, this act was withdrawn by the National Conference of Commissioners on Uniform State Laws in 1938. For it was withdrawn only to be replaced by other legislation drafted by that body, and this replacing legislation imposed substantially the same limited absolute liability "regardless of negligence" as the act in question for "bodily injuries * * * and for death resulting therefrom to individuals on the land and for damage within this state to property on the land". In short, the Commissoners withdrew the act in question, not because of any doubt as to its constitutionality, but because they desired to amplify this self-same policy.[4]

Since the above statute would bar the above defenses, plaintiffs in all cases covered by such statutory provisions, moved to strike such defenses, F.R.C.P. 12(f) or for summary interlocutory judgment, F.R.C.P. 56(d), 28 U.S.C.A. In answer to such motions, both defendant Airlines claimed such provisions of the statute to be unconstitutional, both as depriving them of their property without due process contrary to the Fourteenth Amendment of the United States Constitution[5] and to the provisions of the New Jersey Constitution, Art. I, par. 1,[6] and also as violative of the

---

**4.** 1938 Handbook National Conference of Commissioners on Uniform State Laws, page 318, Uniform Aviation Liability Act, Art. II, §§ 201, 202. This act, much more complicated than the act in question, as previously promulgated by the Commissioners, together with its companion acts, Uniform Law of Air Flight, ibid, page 348, Uniform Air Jurisdiction Act, ibid, page 351, indeed went further than the act in question, since it imposed the same absolute liability in favor of passengers, which the act in question does not do. Art. III, § 302, page 328. It also required the carriers, on the one hand, to carry insurance for the protection of those killed or injured, and on the other hand, placed a maximum limit on the amount of liability. But the latter two provisions, being normally matters of

pure legislative policy, counter-vailing at that, obviously do not affect the constitutional question of the Legislature's right to impose absolute liability, in the first place.

**5.** "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *." U. S. Const. Amend. Art. XIV.

**6.** "1. Natural and unalienable rights.
"1. All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J. Const. Art. I, par. 1, N.J.S.A.

Interstate Commerce clause of the United States Constitution.[7] The question before this Court is thus the constitutionality of the above provisions of the New Jersey statute.

In determining the constitutionality of a legislative act, certain fundamental principles must be borne in mind: (a) the question is one, not of legislative policy, but of legislative power. Atchison, Topeka & Santa Fe R. R. v. Matthews, 1899, 174 U.S. 96, 19 S.Ct. 609, 43 L.Ed. 909. If the legislative branch of the state government has the power under the provisions of both the State and Federal Constitutions, to enact the statute in question, it is not for any court, a part of the judicial authority, co-equal with the legislative, to question such legislation or the wisdom of its exercise. Accordingly, the legislative authority has a wide discretion in the choice of policy to be applied in the governance of the citizenry. As long as this choice is supported by substantial reason and does not violate the fundamental requisites of fairness and justice, the courts can not declare it invalid, as a violation of due process, even though the soundness of the reasons for such choice seem to the courts quite open to debate. Nebbia v. People of State of New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; Day Brite Lighting, Inc. v. State of Missouri, 1942, 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469; Osborn v. Ozlin, 1940, 310 U.S. 53, 66, 60 S.Ct. 758, 84 L.Ed. 1074.

(b) A statute is always presumed to be valid. Ex parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; Nebbia v. People of State of N. Y., supra.

(c) The police power of a state may "prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity." Atchison, Topeka &

Santa Fe R. R. v. Matthews, supra [174 U.S. 96, 19 S.Ct. 612]. On the other hand, the due process clause simply means procedurally the "law of the land", that is, not all procedural principles, but only those which are truly "fundamental". Twining v. State of New Jersey, 1908, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97. Thus the interaction between the police power of a state and the due process clause of the Federal Constitution "demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." Nebbia v. People of State of N. Y., supra [291 U.S. 502, 54 S.Ct. 510]. The inquiry in this regard is simply whether the measure "passes the bounds of reason and assumes the character of a merely arbitrary fiat." Purity Extract etc. Co. v. Lynch, 1912, 226 U.S. 192, 204, 33 S.Ct. 44, 47, 57 L.Ed. 184. Nor may a court invalidate statutes because the court might think that they fail of their purpose, nor because "it might seem to [the court] that they enforce an objectionable policy or inflict hardship in particular instances." Bayside Fish Flour Co. v. Gentry, 1935, 297 U.S. 422, 56 S.Ct. 513, 516, 80 L.Ed. 772.

(d) Since, in passing on the constitutionality of a legislative act, the Federal courts are vested with power to consider "cases" and "controversies"[8] they have no power to consider facts other than those involved in the case at bar. Thus the Federal courts are not at liberty to consider purely suppositious facts, presented merely arguendo by counsel, as occurred here, any more than they are authorized to render advisory opinions. People of State of California v. San Pablo, etc. Ry., 1893, 149 U.S. 308, 13 S.Ct. 876, 37 L.Ed. 747; Gorieb v. Fox, 1927, 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228.

Bearing the above well settled principles in mind, we turn to the consideration of the validity of the above statutory pro-

7. "The Congress shall have power * * * To regulate Commerce * * * among the several States * * *." U. S. Const. Art. I, § 8.

8. U. S. Const. Art. III, § 2.

visions. As to these, defendant owners level their main attack on the ground that the liability of such owners is made absolute, rather than dependent upon negligence. This they claim takes the property of the owners, without due process of law.

In the first place, a reading of the act demonstrates defendants' claim to be too broad. The statute does not make the owner absolutely liable to aircraft passengers, but only "to persons or property on the land or water beneath." In the next place, contributory negligence by plaintiff bars recovery. Again, the "air man" or operator of the aircraft, if not the owner or lessee, is under no circumstances to be held absolutely liable. It is thus clear that the underlying purpose of the act was to place the cost of the dangers of the enterprise upon the industry itself,—a technique, the validity of which is well established by the nation-wide theory of workmen's compensation, for instance,[9]—rather than upon a completely innocent third party, who had never embarked upon such enterprise as had the passenger and the owner, and had no interest in or benefit therefrom. In short, a mere reading of the provisions in question demonstrates not their departure from, but their adoption of, valid legislative techniques, and prima facie at least, reasonable consideration of the varying status of the parties involved.

We pass from this consideration of the statutory terms on their face to a closer scrutiny of the claim of defendant owners that "where a statute imposes absolute liability for an activity which is not extra hazardous, such a statute is invalid as a deprivation of property without due process of law." Taking this claim on its face, it is clearly incorrect. All we need do in this regard is again to turn our attention to the nation-wide policy of workmen's compensation. Here absolute liability is imposed upon practically all businesses, hazardous and non-hazardous alike.

However, not to quibble over mere words, but to go to the heart of the matter, defendants' argument in the present regard must in the end be based upon the proposition either that it is a deprivation of property without due process of law to impose absolute liability at all on any activity, or that it deprives of due process to impose the limited absolute liability set forth in the present statute on the aviation industry. We turn to these two contentions in turn.

From the very earliest records of the history of the common law—the times of Aethelbert and Alfred the Great,—absolute liability was imposed upon one who personally injured another. In fact, the inception of the doctrine of torts was that of absolute liability. On this, practically all common law historians agree.[10] Indeed, the authorities show that negligence was unknown to the law till some thousand years later. Historically, therefore, at common law, absolute liability for torts was from the earliest times not merely recognized as due process of law, it was *the* due process of law.

Furthermore, that absolute liability is recognized today as due process of law, we have on the highest authority. In Crowell v. Benson, 1932, 285 U.S. 22, 82, 52 S.Ct. 285, 304, 76 L.Ed. 598, the highest court in the land said: "the power, under proper circumstances, to provide for liability without fault. * * * is beyond question." Similarly, in New York Central R. Co. v. White, 1917, 243 U.S. 188, 204, 37 S.Ct. 247, 253, 61 L.Ed. 667, the same court said: "liability without fault is not a novelty in the law. The common-law liability of the carrier, of the innkeeper, or him who employed fire or other dangerous agency or harbored a mischie-

---

9. New York Cent. R. Co. v. White, 1916, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667; Sexton v. Newark Dist. Tel. Co., 1913, 84 N.J.L. 85, 86 A. 451.

10. Eldredge, Modern Tort Problems, page 28, 2 Holdsworth; History of English Law, 3rd Edition 51, 1 Pollock & Mait-

land History of English Law before the time of Edward I 1895, page 31; Wigmore Responsibility for Tortious Acts, 7 H.L.R. 441; Ames Law & Morals, 22 H.L.R. 97; Jeremiah Smith, Tort and Absolute Liability, 30 H.L.R. 241, 319, 409.

vous animal, was not dependent altogether upon questions of fault or negligence. Statutes imposing liability without fault have been sustained. * * *" See to the same effect City of Chicago v. Sturges, 1911, 222 U.S. 313, 32 S.Ct. 92, 56 L.Ed. 215. The doctrine of absolute liability was well recognized in New Jersey long before the enactment of the statute in question.[11] There can be no question, then, that absolute liability is not per se invalid.

Defendants' final contention on this ground must therefore be that, while absolute liability may at times be imposed, it is unlawful to impose it under the circumstances at bar.

The first question is, whether any action at all by the Legislature was requisite in order to create such liability. The American Law Institute, recognized throughout the United States as our outstanding association of jurists, has this to say as to the aviation industry, and as to those other than passengers who are harmed thereby, "although the utmost care is exercised (by the industry) to prevent the harm." : "Thus, aviation in its present state of development is ultrahazardous, because even the best constructed and maintained aeroplane is so incapable of complete control that flying creates a risk that the plane, even though carefully constructed, maintained and operated, may crash to the injury of persons, structures and chattels on the land over which the flight is made.[12] "* * * Thus, one of the risks of aviation is that the plane being flown at a high altitude and over a large area may encounter dangerous weather conditions which would be altogether abnormal on the surface of the earth. The chance that the aviator will encounter them is one of the risks which makes aviation an ultrahazardous activity. In this particular, aviation differs from activities which

are carried on on the surface of the earth, the safety of which is rarely dependent upon unexpectable weather conditions."[13]

Note the statement of the Editor of The Journal of Air Law and Commerce, Professor of Law, Northwestern University, Professional Staff Member U. S. Senate Committee on Interstate and Foreign Commerce, that "Up to the beginning of World War II * * * the number of passenger lives lost per passenger mile traveled by scheduled air lines has always exceeded the number of lives lost per passenger mile traveled on the railroads."[14] The fact that this may not be true statistically as to non-fatal injuries, hardly proves that air transportation is not ultrahazardous, since death, not a broken leg, is the "ultrahazard". Though, of course, it is true that this "ultrahazard" faces a passenger more often than one on the ground, due to the fact that plane crashes generally occur in open country. Nor is it persuasive, as claimed by defendants, that many more persons in the Newark-Elizabeth area were killed by automobile than by airplane during the same period. For these figures utterly disregard the great density of automobile traffic, as compared with the relative paucity of airplane traffic. Were airplane traffic in that area as dense as automobile traffic—an utterly inconceivable situation at present—the results—staggering to the imagination—would then alone be comparable. After noting with apparent approval the above quoted findings of the American Law Institute, and adding that "approximately one out of every six aircraft in operation in 1939 was involved in some kind of an accident", the Journal of Air Law and Commerce continues:

"The reported cases support the proposition that the imposition of absolute liability upon the aircraft operator would

---

11. Workmen's Compensation N.J.S.A. 34:-15–1; Dogbite Law N.J.S.A. 4:19–16; Lateral Support Law N.J.S.A. 46:10–1.

12. Restatement Torts, § 520, Comment (b), page 43.

13. Restatement Torts, Sec. 520, Comment (d), page 44.

14. Journal of Air Law and Commerce, Vol. 19, No. 2 "Is Special Aviation Liability Legislation Essential?", page 167. This question the learned and expert aviation author answers in the affirmative.

not be a denial of due process of law under the Federal Constitution, if it can successfully be contended that the operation of aircraft is an ultrahazardous activity as to the persons for whose benefit absolute liability is imposed. The peculiar nature of the hazards imposed and the inability of the person exposed to it to protect himself in the exercise of reasonable care seems to be the constitutional basis for the imposition of absolute liability."

The Journal similarly concludes that "The equal protection clause of the Federal Constitution would not inhibit the imposition of such absolute liability", and also that as to such a liability constituting "an unjust burden upon interstate commerce. It would not seem that such would be a valid objection if it be determined that the imposition of such liability is a proper exercise of the police power of the State, for any regulation of interstate commerce would be purely incidental". The Journal finally concludes by recommending an absolute liability aviation statute, though Federal, not State, as to persons on the ground:

"Persons on the ground (not on a landing area of an established airport) should be compensated for injuries directly attributable to the operation of aircraft, irrespective of the aircraft operators' negligence * * *. The imposition of absolute liability by legislation under such circumstances involves no departure from law as it is now developing. * * * Important as the continued development of civil aviation is believed to be, no convincing reason has been presented why it should be subsidized at the expense of the luckless victim on the ground who, without participating in aviation in any way, is injured by an aircraft accident even though not attributable to the fault of the operator." [15]

This concurrence both of our leading jurists and of one of our leading legal aviation experts, forcefully supports the conclusion that aviation is ultrahazardous.[16] Since there is thus good reason to consider aviation ultrahazardous, aviation falls into the category of blasting, of the storage of dynamite, of drilling for oil, of the escape of fire from trains,[17] the peculiar dangers of each of which subject those engaged therein to liability without fault at common law, in the absence of statute, according to the viewpoint of the above Restatement of Torts. Indeed, the courts have already laid down much the same principles as to aviation at common law in the absence of statutes.[18]

If then, limited absolute liability is valid as to aviation at common law, a fortiori such liability is valid when the legislative representatives of the people of the State have declared it to be the public policy and law of the State. For that is the very function entrusted

15. Id. 319, 324.

16. Indeed, that this expert conclusion is concurred in by the pubic at large, for whose welfare the Legislature was concerned, is evidenced by the very heavy insurance taken out before flight by the average aviation passenger, as compared with the relatively rare taking out of similar insurance by the passenger by rail.

17. Atchison, Topeka & Santa Fe v. Matthews, supra; Northwestern Utilities v. London Guar. & Acc. Co. [1936] A.D. 108, 105 L.J.P.C. 18; National Tel. Co. v. Baker, [1803] 2 Ch. 186, 62 L.J.Ch. 699; Eastern & S. A. Tel. Co. v. Cape Town Tramways, [1902] A.C. 381, 71 L.J.P.C. 122; Jefferson v. Derbyshire Farmers [1921] 2 K.B. 281, 90 L.J.K.B.

1361. Cf. Musgrove v. Pandells [1919] 2 K.B. 43, 88 L.J.K.B. 915; French v. Center Creek Powder Mfg. Co., 1913, 173 Mo.App. 220, 158 S.W. 723. See 1932, 80 U.Pa.L.Rev. 924; 1932, 17 Corn. L.Q. 703; Smith, Liability for Substantial Physical Damage to Land by Blasting, (1920) 33 Harv.L.Rev. 542, 667; Note, 1935, 19 Minn.L.Rev. 322; see supra, pp. 79–81; Green v. General Petroleum Corp., 1928, 205 Cal. 328, 270 P. 952, 60 A.L.R. 475; Robb v. Carnegie Bros. & Co., 1891, 145 Pa. 324, 22 A. 649, 14 L.R.A. 329, 27 Am.St.Rep. 694.

18. Guille v. Swan, 19 Johns., N.Y., 381, 10 Am.Dec. 234; Rochester Gas & Electric Corp. v. Dunlop, 1933, 148 Misc. 849, 266 N.Y.S. 469; Kadylak v. O'Brien, 1941, F. D.C.Pa.U.S.Av.Rep. 8; Gardys v. U. S., 1951, U.S.Av.Rep. 352.

by the Constitution to the keeping of the legislature, subject to the limitation that this determination shall not be a purely arbitrary one, but shall have reason in its support. In other words, to constitute a proper regulation of the rights of all affected by aviation—and this is what the entire statute in question does as to torts, contracts, crimes and property rights—the statute must have a reasonable relation to the public health, welfare and safety. Then, as seen above, it is a proper exercise of the police power. Then, by the same token, it does not deprive of property without due process of law, Atchison, Topeka & Santa Fe R. R. v. Matthews, supra, Chicago, R. I. & P. R. Co. v. Zernecke, 1902, 183 U.S. 582, 22 S.Ct. 229, 46 L.Ed. 339, as to statute covering even passengers on a railroad.

That the provisions of the statute in question do have a reasonable relation to the public welfare would seem clear from what has already been said. Certainly, the New Jersey Legislature, in view of the above evidence as to the ultrahazardous character of the aviation industry, had the right to reach the same conclusion, and to select as applicable to aviation, the very legal policy which the jurists of the American Law Institute, let alone the above legal aviation expert, deemed the soundest and fairest of all applicable policies.

Indeed, there are additional reasons why this choice of policy by the New Jersey Legislature bears a reasonable relation to the public welfare, thus validating the legislative choice as a proper exercise of the police power. As is said in Broom, Maxims, 249 "There is no obligation to do impossible things." 2 Bouvier's Law Dictionary, Rawles 3rd Revision, 2137. This axiom applies with peculiar force to the statutory provisions in question. For the above article from the Journal of Air Law and Commerce quotes Dean John H. Wigmore as having found, after investigation as to aviation accidents, that "not in

twenty per cent of the accidents which have thus far occurred would it have been possible for the plaintiff to find and produce provable evidence of the real cause of the accident." [19] And the writer continues that, with regard to the fatal aviation accidents occurring in 1939, "plaintiff could establish liability in about thirty-four per cent of all cases." [20] Indeed, the National Conference of Commissioners on Uniform State Laws, in drafting their new act in 1938, above alluded to, expressly included therein the following:

"Section 103. (Statement of Policy.) The Legislature finds as a fact that it is rarely possible for individuals who have been injured or for the personal representatives of individuals who have been killed or for persons whose property has been lost or damaged in or as the result of an aircraft accident, to establish the cause of the accident. Public policy demands that compensation should not be denied to any person because of his inability to prove negligence or his inability to rebut evidence offered by operators of aircraft that they were not guilty of negligence. It is primarily for this reason that certain provisions of this act impose liability upon operators of aircraft regardless of negligence." [21]

In short, if the statute were not in effect—nor the common law rule above alluded to, and this rule differs in different states—plaintiffs could prove their right to recover in but one-fifth to one-third of their cases. In other words, in the great bulk of such cases, the injured plaintiffs, or their decedents in death cases, though innocent third parties, would be utterly unable to recover for the injury or death which befell them. Surely the Legislature had a right to provide a remedy for this. That such a decision by the Legislature bears a reasonable relation to the public welfare is too clear for argument. That the New Jersey Legislature did have this view and that the statutory provisions in

19. Journal of Air Law and Commerce, Vol. 19, No. 2, page 168.

20. Id. page 169.

21. 1938 Handbook National Conference of Commissioners on Uniform State Laws, Uniform Aviation Liability Act, Art. I, § 103, page 320.

question are considered valid by the State courts in New Jersey is indicated prima facie from the decision in the Bergen County Court of Common Pleas in the case of Kirschner v. Jones & White, 1932 U.S. Av.Rep. 278, where, after the enactment of the statute in question, the court sustained a verdict for plaintiff in a case where defendant's plane crashed on the roof of plaintiff's home—a situation practically on all fours with the cases at bar. This case is indeed the only known decision so far interpreting the statutory provisions in question.[22]

Defendants' attack upon the validity of the above statutory provisions, as a deprival of property without due process, thus fails.

The provisions of the New Jersey Constitution, on which defendants rely, Art. I, § 1, are substantially identic today with the provisions of the New Jersey Constitution of 1844, immediately preceding the present State Constitution. These provisions were interpreted by the highest New Jersey State court to be equivalent to the due process clause of the Federal Constitution. State Board of Milk Control v. Newark Milk Co., 118 N.J.Eq. 504, 179 A. 116 (E & A.1935). Hence defendants' reliance on the above provisions of the New Jersey Constitution is equally without merit.

Defendants further attack the validity of these statutory provisions as an invalid restraint upon interstate commerce. The statutory provisions in question clearly show that:

(1) They do not affect the actual movement of airplanes in interstate commerce.

(2) They do not affect the average airplane, even financially, as would a tax.

(3) They only affect an airplane owner financially on the occurrence of an accident. Such an accident the defendant own-

ers will certainly agree is not the ordinary result of air travel.

(4) The benefit of the statutory provisions does not go to any one who in any wise participates in such air travel, such as passengers, but only to those who are, under ordinary circumstances, entire strangers to air travel, and who are totally without fault themselves.

■■■■■ It is obvious from the above that the effect of the above statutory provisions on interstate commerce is indirect and casual. It is equally obvious that the effect of such statutory provisions on the public welfare has the clearest of reason in its support, and is a rational exercise of the police power. The principle has been settled in a host of cases that if a statute is a proper exercise of the police power, and has but an indirect effect upon interstate commerce, it is not an invalid interference with interstate commerce.[23]

The few authorities cited by defendants as in their support are so dissimilar in fact as not to be analogous. Nor do the statutory provisions in question conflict with Congressional control of interstate commerce. The field covered by them is entirely different from that covered by the Civil Aeronautics Act of 1938, 49 U.S. C.A. § 401 et seq.

Defendants' claim that the statutory provisions in question are invalid as an unreasonable burden on interstate commerce is thus insubstantial.

Since defendants' attack on the statutory provisions in question, as unconstitutional, are found to be without merit, plaintiffs' motion to strike the defenses barred by the New Jersey Act N.J.S.A. 6:2–7 is granted. On the motions for summary judgment presumably under F.R.C.P. 56 (d), counsel will be heard further, on motion, if desired. Counsel will present forms of order accordingly in all cases here involved.

22. In this case the records show that, as here, one of the defenses inserted was act of God. Plaintiff moved to strike same. On this motion the Court's at-

tention was called to the statute in question. The defense was ordered stricken.

23. 11 Am.Jur., Constitutional Law, Sec. 265, page 1002.