ABBOTTS DAIRIES, INC., APPELLANT, v. C. WESLEY ARM-
STRONG, JR., DIRECTOR, OFFICE OF MILK INDUS-
TRY, RESPONDENT, AND DENNERY'S DAIRIES, *ET AL.*,
APPELLANTS, v. C. WESLEY ARMSTRONG, JR., DIREC-
TOR, OFFICE OF MILK INDUSTRY, RESPONDENT.

Argued November 9, 1953—Decided January 18, 1954.

320

*Mr. Morris Duane,* of the Philadelphia Bar, argued the cause for the appellants (*Messrs. Curry & Purnell,* attorneys; *Messrs. Duane, Morris & Heckscher,* of the Philadelphia Bar, counsel).

*Mr. Joseph Lanigan,* Deputy Attorney-General, argued the cause for the respondent (*Mr. Theodore D. Parsons,* Attorney-General).

The opinion of the court was delivered by

JACOBS, J.   These are consolidated appeals from price fixing orders issued by the Director of the Office of Milk Industry of our State Department of Agriculture.   We have certified the appeals on our own motion under *R. R.* 1 :10–1.

On March 31 and April 1, 1953 the Director conducted public hearings during which representatives of milk producers, distributors and consumers were heard fully.   On April 16, 1953 he issued orders which set minimum prices for the sale of designated grades of milk in certain situations and in addition set "fixed" or identical minimum and maximum prices for the sale of designated grades of milk by dealers to consumers and schools.   The appellants do not

question the validity of the minimum prices set by the Director. However, they attack the fixed prices to consumers and schools contending: (1) that while the milk control statute provides for minimum prices it does not empower the Director to impose any fixed or maximum prices; (2) that the statute may not constitutionally grant such power; (3) that the orders setting fixed prices applied only to certain areas within the State and since they were not statewide they were invalid, and (4) that the findings of fact which accompanied the orders contained nothing whatever which bore on fixed or maximum prices and were therefore insufficient. These contentions will be considered in the full light of the history, purpose and terminology of the legislation. See 3 *State Milk and Dairy Legislation* (1941), *p.* 1; *Mortenson, Milk Distribution as a Public Utility* (1940), *p.* 7; *The New Jersey Department of Agriculture 1916-1949* (1950), *p.* 247.

During the first World War the Federal Government adopted emergency measures which were designed to insure a constant supply of milk to consumers; included were regulations aimed at excess charges and profiteering. Postwar economic conditions through the Twenties were such that no need appeared for any price controls within the industry. In the Thirties, however, the situation changed radically. Production of milk increased while consumer purchasing power decreased. Milk prices dropped and farmers were unable to meet their costs. In an effort to impel higher prices farmers struck, milk was dumped and there was violence and bloodshed, all to no avail. The demoralizing trade practices were endangering the constant flow of wholesome milk to consumers and the demands for governmental control, federal and state, became insistent. In 1933 Congress enacted the Agricultural Adjustment Act and in April of the same year New York passed the first of the state milk control acts. New York's statute provided that the board shall ascertain what prices for milk will best protect the industry and insure a sufficient quantity of pure and wholesome milk, shall fix minimum prices, and may fix maximum

prices. In *Nebbia v. New York*, 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940 (1934), the defendant was convicted of selling milk below the price of nine cents which had been set by the board as the minimum price for a quart of milk on its sale by a store to a consumer. The Supreme Court upheld the New York statute and the defendant's conviction; it found that the milk industry was subject to regulation in the public interest and that the board's order was not "arbitrary, discriminatory or demonstrably irrelevant" to the policy which the Legislature was constitutionally free to adopt.

In May 1933 New Jersey's original Milk Control Act was adopted. *L.* 1933, *c.* 169. It described the nature of the emergency in the industry and created a Milk Control Board, empowered in Article III "to supervise and regulate" the entire milk industry in those matters required to prevent unfair, unjust, destructive and demoralizing trade practices. Article V dealt with the licensing of milk dealers and provided that licenses could be refused or revoked in various situations, including any instance where "the licensee has been a party to a combination to fix prices contrary to the provisions" of the act. Article VI provided that no licensee shall operate under any mutual or secret understanding with any other licensee "whereby the price for fluid milk to be paid to producers in this State is fixed or reduced or the price to be paid by the consumers for such milk is fixed or increased" pursuant to such agreement. Article VII provided that the board may "ascertain, determine and fix" such prices to be paid "to the producer and to be charged the consumer for milk" as will best protect the supply of milk and "insure a sufficient quantity of pure and wholesome milk to the inhabitants of this State, having special regard to the health and welfare of children and be most in the public interest." Article VII was amended in June 1933 and May 1934, in respects which are not material here. *L.* 1933, *c.* 255; *L.* 1934, *c.* 132.

Our original Milk Control Act did not confine the board to the fixing of minimum prices; indeed, nowhere in

the entire act did the word "minimum" appear. Article III which vested the general rule-making power in the board made no mention of prices. And Article VII which vested the specific price fixing power in the board did not limit it to minimum prices but, on the contrary, afforded authority to ascertain, determine and fix producer and consumer prices. Taken in its generally accepted meaning, this language clearly encompassed authority to prescribe a price which would be both minimum and maximum. *Cf. McKann v. Irvington*, 133 *N. J. L.* 63, 67 (*Sup. Ct.* 1945), affirmed 133 *N. J. L.* 575 (*E. & A.* 1946). Statutory language is to be given its ordinary meaning in the absence of specific intent to the contrary. See *Board of National Missions v. Neeld*, 9 *N. J.* 349, 353 (1952); *Grogan v. DeSapio*, 11 *N. J.* 308, 323 (1953); *General Public Loan Corp. v. Director, Div. of Taxation*, 13 *N. J.* 393, 400 (1953). While it is true that the immediate evil in 1933 was price cutting, it does not at all follow that the Legislature intended to restrict the board to the imposition of minimum prices. The legislative intervention was grounded entirely upon the public interest and the Legislature may properly have believed that in undertaking to exercise control over the milk industry it ought empower its administrative agent not only to fix, if necessary, minimum prices fair to the industry but also, if necessary, maximum prices fair to the consuming public. The New York statute which served as the prototype for our act was also impelled by the 1933 economic situation, but the New York Legislature, having undertaken to exercise milk control in the public interest, not only directed the fixing of minimum prices but also afforded explicit authority to fix maximum prices. Although our Legislature did not use the word "maximum," it likewise did not use the word "minimum" and the comprehensive language it did use was appropriately designed to include both. In *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504, 521 (*E. & A.* 1935), our original act was sustained and though the court had no occasion to consider whether the board had power to fix maximum prices, it did note that the plainly

expressed legislative objective was "the maintenance of a price level that will yield only a reasonable return for the producers' labor and investment, and thus insure an adequate supply of wholesome milk." In rejecting the attack on the constitutionality of the act the Court of Errors and Appeals embraced fully the views expressed in the *Nebbia* case, *supra*, where Justice Roberts concluded his oft-cited opinion with the following pertinent remarks (291 *U. S.*, at *p.* 538, 54 *S. Ct.*, at *page* 516, 78 *L. Ed.*, at *p.* 957) :

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer"'s interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

On April 1, 1935 an order setting minimum prices of milk sold by dealers to stores was entered and was later attacked on the ground that Article VII of the act authorized the fixing of the price to be paid to a producer and the price to be charged to a consumer but did not permit the fixing of price for milk sold by dealers to stores. This contention was sustained in *Supplee-Wills-Jones Milk Co. v. Duryee*, 116 *N. J. L.* 75 (*Sup. Ct.* 1935), where the court

found: (1) that the special price-fixing power in Article VII was not broad enough to extend to sales by dealers to stores, and (2) that the general rule-making power in Article III could not be invoked to supply the omission since it made no specific reference to prices and could not therefore be construed to embody any price-fixing authority. But *cf. Gaine v. Burnett*, 122 *N. J. L.* 39 (*Sup. Ct.* 1939), affirmed 123 *N. J. L.* 317 (*E. & A.* 1939). However, this was corrected when the Legislature passed the Milk Control Act of 1935 (*L.* 1935, *c.* 175). This act was intended as a continuation of *L.* 1933, *c.* 169, which was about to expire under its express terms. In section 700 the special price-fixing power was rephrased to relate solely to minimum prices and to include sales by dealers to stores and others. At the same time, however, the general rule-making power in section 301 was enlarged to include specific authority "to fix the price at which milk is to be bought or sold." The purpose of the Legislature seems fairly evident. It dealt in detail in section 700 with the immediately pressing problem of fixing minimum prices, and to guard against omissions (*cf. Supplee-Wills-Jones Milk Co. v. Duryee, supra*) and provide in the public interest for price-fixing beyond the minimum prices contemplated in the special power, it expressly granted in section 301 a general power to fix prices, including maximum as well as minimum. The suggestion is made that the special power in section 700 was exclusive and that the general power in section 301 merely had reference thereto. But acceptance of this suggestion would, in effect, strike out as surplusage the specific grant in section 301 of comprehensive power to fix milk prices; to do this would not only run counter to basic rules of statutory construction but would also disregard the legislative history which discloses that the price fixing language was deliberately included in the general rule making power of the 1935 act after its omission from the comparable provision of the 1933 act had become an issue in *Supplee-Wills-Jones Milk Co. v. Duryee, supra.* See *Hoffman v. Hock*, 8 *N. J.* 397, 406 (1952), where Justice Ackerson recently restated for this court the

well-recognized rule that a "construction that will render any part of a statute inoperative, superfluous or meaningless, is to be avoided."

In *chapter* 56 of the *Laws of* 1937 the 1935 Milk Control Act was amended and continued until 1939 and in chapter 82 of the *Laws of* 1939 a third Milk Control Act was enacted to remain in effect until 1941. In *chapter* 274 of the *Laws of* 1941 a fourth Milk Control Act was enacted to remain in effect until the legislature terminates its operation. Section 21 of the 1941 act vested general regulatory powers in the Director, including the express power to "fix the price at which milk is to be bought, sold, or distributed." Section 22 vested the specific power to fix minimum prices. These sections are comparable to the provisions in the earlier legislation and both are to be given full effect. Any doubt on this score seems to have been removed by the clear terms of section 48 which provides that the operation of any provision of the act conferring a general power upon the Director "shall not be impaired or qualified" by the granting of a specific power not inconsistent with the general power. We find no such inconsistency. When the Director is fixing minimum prices he is guided by the specific standards set forth in section 22, and any violation of his orders is governed by other provisions, including several which deal solely with minimum prices. In actual practice these minimum prices may operate, by virtue of normal forces within the industry, as maximum prices, with the result that no real need arises for the official imposition of maximum prices. However, at any given time the Director may be satisfied that the then prevailing competitive conditions are such that the minimum prices will not also operate as the maximum prices and that protection of the consuming public and advancement of the public interest require that he take further steps to insure that end. We are satisfied that in such event he may, without in anywise running counter to the terms or purposes of section 22, invoke the omnibus price-fixing authority conferred by section 21 and prescribe that the minimum prices shall also constitute the maximum prices.

█ In 1948 the Legislature continued and transferred milk control functions to the Office of Milk Industry within the Department of Agriculture. *L.* 1948, *c.* 447. An attack on this legislation and the 1941 Milk Control Act was rejected in *Como Farms, Inc. v. Foran*, 6 *N. J. Super*. 306 (*App. Div.* 1950), where the court pointed out that the Legislature has not terminated the provisions of the 1941 act and they remain in effect; in the course of its opinion it indicated that the legislative declaration of emergency is entitled to full respect in the absence of affirmative proof to the contrary. See *East New York Savings Bank v. Hahn*, 326 *U. S.* 230, 235, 66 *S. Ct.* 69, 90 *L. Ed.* 34, 38 (1945); *Block v. Hirsh*, 256 *U. S.* 135, 154, 41 *S. Ct.* 458, 65 *L. Ed.* 865, 870 (1921). Although the Director's order in the *Como* case merely fixed minimum prices, the court there sustained the standard in section 21 of the 1941 act which it described as expressly authorizing "the Director to take such measures including the fixing of prices and the promulgation of regulations" as may be necessary to achieve the stated statutory objectives. See also *B. R. Waldron & Sons Co., Inc. v. Milk Control Board*, 131 *N. J. L.* 267, 270 (*Sup. Ct.* 1944), affirmed 131 *N. J. L.* 388 (*E. & A.* 1944), where the court used broad language of similar import.

██ In the light of all of the foregoing we believe that the present Milk Control Act (*R. S.* 4:12A–1 *et seq.*) must be construed to authorize the Director to set fixed prices which constitute maximum as well as minimum prices. And, thus construed, we find no unconstitutional grant of power. As Justice Heher said in the *Waldron* case, *supra* (131 *N. J. L.*, at *p.* 270) the production and distribution of milk are intimately identified with the health and welfare of the people and the business is "affected with a public interest warranting price and marketing regulation." See *State Board of Milk Control v. Newark Milk Co., supra; Nebbia v. New York, supra; Como Farms, Inc. v. Foran, supra.* Such regulation must, of course, not be arbitrary, discriminatory or unrelated to the statutory objectives (*Nebbia v. New York, supra*), but fixed price requirements are not such

*per se.* The legislative purpose was not simply to protect the industry (*National Dairy, &c., Co. v. Milk Control Board,* 133 *N. J. L.* 491, 497 (*Sup. Ct.* 1945)); it was to advance the public welfare generally by providing flexible administrative means which would stabilize prices and support a constant flow of wholesome milk to consumers. Since ordinarily minimum prices operate in practice as maximum prices as well, the imposition of minimum prices based on fair returns as prescribed by section 22, protects both sellers and purchasers. Where, however, economic conditions are such that the minimum prices will not in practice approximate the maximum prices, it would seem unfair to the public to impose minimum prices which insure fair returns to the industry without corresponding ceilings for the protection of the consuming public and the general welfare.

Excessive as well as inadequate prices may well deprive consumers of their vital milk needs and, as indicated in the *Nebbia* case, milk regulations are not to be set aside where they fix prices which are "fair to those engaged in the industry and to the consuming public" (291 *U. S.,* at *p.* 538, 54 *S. Ct.,* at *p.* 516, 78 *L. Ed.,* at *p.* 958). Nor is there substance to the notion that the sweep of the cases which have sustained price regulations in the milk field is to be confined to minimum prices. All of those decisions broadly recognized that the business of producing and distributing milk is affected with a public interest and that price-fixing orders, like other regulations in the field, are "lawful if substantially related to a legitimate end sought to be attained." *Cf. Cities Service Gas Co. v. Peerless Oil & Gas Co.,* 340 *U. S.* 179, 186, 71 *S. Ct.* 215, 219, 95 *L. Ed.* 190, 201 (1950); *United States v. Rock Royal Co-Operative,* 307 *U. S.* 533, 570, 59 *S. Ct.* 993, 83 *L. Ed.* 1446, 1468 (1939), rehearing denied, *Dairymen's League Co-op Ass'n v. Rock Royal Co-op, Inc.,* 308 *U. S.* 631, 60 *S. Ct.* 66, 84 *L. Ed.* 526 (1939). The very precedents upon which they relied dealt largely with fixed rather than minimum charges; included were the familiar holdings sustaining utility rates, insurance rates, usury laws, special rent laws, and many

others. See *People v. Nebbia,* 262 *N. Y.* 259, 186 *N. E.* 694 (*Ct. App.* 1933) ; *Nebbia v. New York, supra; State Board of Milk Control v. Newark Milk Co., supra.* See also *Gaine v. Burnett, supra,* where the former Supreme Court, in sustaining liquor price regulations, pointed out that our State, through its laws and commissions, had "fixed the price to be charged by railroads, transportation companies, investors, bankers, gas and electric companies, telegraph and telephone companies and insurance companies," and that "price fixing, in the purchase and sale of milk" had been upheld by our court of last resort. We are entirely satisfied that the Legislature had adequate constitutional authority to delegate to the Director, as it has done under section 21, power to direct that minimum prices fixed under section 22 shall also constitute maximum prices.

Since conditions vary in different parts of our State the Director has by general orders divided the State into five marketing areas. On April 16, 1953 he issued five orders, each of which applied to a different marketing area and embodied provisions for fixed prices for the sale of designated grades of milk by dealers to consumers and schools. Only two of these orders are involved in these appeals and the appellants assert that they are invalid since they apply only to designated areas and are not statewide. We consider this contention to be entirely without merit. Section 22 expressly authorizes minimum prices for particular areas and we are satisfied that when the minimum prices are also made the maximum prices under the authority of section 21 they are properly confined to the same areas. Furthermore, in the instant matter, fixed prices were, in substance, imposed for the entire State, and though they were not identical we find nothing whatever in section 21 which compels statewide uniformity in benighted disregard of the varying conditions and requirements of the respective marketing areas of the State.

We come now to the final issue as to whether the Director's findings of fact were sufficient. To fix the price of milk is to prescribe future conduct and is legislative in

nature. *Como Farms, Inc. v. Foran, supra,* at *p.* 313. While the Legislature might have undertaken the function itself, practical governmental necessities dictated its delegation to an administrative agency empowered to investigate and ascertain the facts and administer the legislative policy within the standards prescribed. *Ward v. Scott,* 11 *N. J.* 117, 123 (1952). In creating the agency and setting forth its powers and duties the Legislature sought to avoid the inflexibility and formalism of procedure in trial courts, indicia which are now rapidly being shed even there. But while so doing it has sought to insure the application of the vital attributes of traditional judicial hearings and findings with their firmly embedded and far-reaching concepts of due process and fair play. Thus, in section 23 it has expressly provided that before fixing or refixing any price the Director shall give public notice, conduct public hearing and issue "findings of fact and an order based upon the evidence adduced at said hearing." *R. S.* 4:12A–23. *Cf. R. S.* 4:12A–20. The hearing prescribed by the Legislature need not, of course, conform strictly with common-law rules of evidence or procedure. *Cf. Norwegian Nitrogen Products Co. v. United States,* 288 *U. S.* 294, 53 *S. Ct.* 350, 77 *L. Ed.* 796 (1933); *United States v. Nugent,* 346 *U. S.* 1, 73 *S. Ct.* 991, 97 *L. Ed.* 1417 (1953); *In re Port Murray Dairy Co.,* 6 *N. J. Super.* 285, 295 (*App. Div.* 1950). Nevertheless, an essential of the fair hearing contemplated by the statutory provision is that the evidence or material upon which the Director may rely to support his order be appropriately disclosed and made part of the hearing record, with ample opportunity of refutation afforded to the interested parties. *Cf. Krauss v. A. & M. Karagheusian, Inc.,* 13 *N. J.* 447 (1953); *In re Plainfield-Union Water Co.,* 11 *N. J.* 382 (1953); *Family Finance Co. v. Gough,* 10 *N. J. Super.* 13 (*App. Div.* 1950). And the Director's order must be accompanied by adequate findings which determine the basic facts and embody his conclusions resting thereon. These findings are of the utmost importance not only in insuring a responsible and just determination by the Director, but also in affording

a proper basis for effective judicial review. See *Household Finance Corp. v. Gaffney*, 11 *N. J.* 576 (1953); *Delaware, L. & W. R. Co. v. City of Hoboken*, 10 *N. J.* 418 (1952); *Central R. R. Co. of New Jersey v. Department of Public Utilities*, 7 *N. J.* 247 (1951); *New Jersey Bell Telephone Co. v. Communications Workers, etc.*, 5 *N. J.* 354 (1950); *Pennsylvania R. R. Co. v. N. J. State Aviation Com.*, 2 *N. J.* 64 (1949); *Bergsma v. Town of Kearny*, 24 *N. J. Super.* 43 (*App. Div.* 1952); *Family Finance Corp. v. Gough, supra*.

In the instant matter the appellants do not question the propriety of the hearing conducted by the Director. Nor do they attack the sufficiency of the findings insofar as they relate to the minimum prices set by the Director. Their sole attack is on the adequacy of the findings supporting the Director's action in prescribing that the minimum prices for the sale of designated grades of milk by dealers to consumers and schools shall also constitute the maximum prices. We consider that, under the particular circumstances presented, this attack is well grounded. From 1933 to 1953 all of the price orders, without exception, set minimum prices alone and presumably no occasion arose for going further. Now for the first time the Director has concluded that protection of the consuming public and fulfillment of the statutory objectives require that certain minimum prices be made maximum prices. But nowhere in the record are we given any facts which furnish support for his resulting order. The testimony at the hearing has not been furnished to us by the parties and their stipulation in lieu thereof contains no reference whatever to current economic conditions or any other enlightening material. Similarly, the Director's findings do not point to the fact that he has set certain fixed rather than minimum prices and they omit entirely any mention of supporting circumstances and reasons. It seems to us that, particularly in view of the consistent prior history, it was vital that the Director set forth fully the basic facts and conclusions which dictated his action. We believe that the interests of justice will best be served by remanding the proceedings to the Director for such supplemental hearing

as may be called for by the intervening lapse of time and the principles expressed in this opinion, and for the entry of appropriate orders accompanied by adequate findings of facts. See *D. L. & W. R. Co. v. City of Hoboken, supra; Family Finance Corp. v. Gough, supra.*

The provisions of the Director's orders which imposed fixed prices are set aside and the causes are remanded to the Office of Milk Industry for further action in conformity with this opinion.

HEHER, J. (for reversal). The essential question is one of power to fix maximum as well as minimum sale prices; and unless it be conferred in terms sufficiently certain and definite to admit of no reasonable doubt of the purpose, the power is to be denied.

There are certain constitutional principles involved in the inquiry; and perforce the legislative expression is assayed in the context of these fundamental limitations upon the exercise of the power to control the price of commodities.

The Anglo-American ideal of free enterprise inherent in our constitutional system is qualified by the principle that a business affected with a public interest is subject to price control and otherwise regulable by the legislative authority for the protection of that interest. The police power extends to all the great public needs; but regulatory measures that go beyond the common need constitute an undue interference with the private right of property and liberty of contract that have constitutional security.

For legislative price regulation and kindred supervision, general concern for the maintenance of the particular business is not enough; it is requisite that the public have a special and definite interest in the use calling for public regulation to serve that interest. One's business is not clothed with a public interest unless it bears such a substantial and definite relation to the common welfare as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use. Price control to serve a public exigency shall not go beyond the demands of the

public interest which vindicates its exercise, and shall in no wise be arbitrary or capricious, for an exercise of power that exceeds the bounds of reasonable necessity would run afoul of the fundamental common right to engage in a lawful pursuit and of the right of private property secured by the Fifth and Fourteenth Amendments of the Federal Constitution, and Article I of the State Constitution of 1947, in this case its counterpart in the 1844 Constitution. Arbitrary action under the guise of the police power is inadmissible. The police power is exercisable only to serve a basic interest of society; it is not invocable for the economic protection alone of particular individuals or groups of individuals. The relief sought must come within the range of a reasonable requirement for the common good and welfare; and a measure that, in the purported service of that end, goes beyond the common need is not effective to curtail the personal and private property rights secured by the cited constitutional guaranties. *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504, 516 (*E. & A.* 1935); *Reingold v. Harper*, 6 *N. J.* 182, 190 (1951); *Duff v. Trenton Beverage Co.*, 4 *N. J.* 595 (*Sup. Ct.* 1950).

In sustaining the New York statute providing for maximum-minimum milk price regulation, as a lawful exercise of the police power to control the business in the public interest, the Federal Supreme Court declared that property becomes clothed with a public interest "when used in a manner to make it of public consequence, and affect the community at large," and in that sense the phrase "affected with a public interest" is the equivalent of "subject to the exercise of the police power," and therefore means no more than that "an industry, for adequate reason, is subject to control for the public good"; and that it is a corollary of the principle that the state may regulate the prices to be charged for the products or commodities of a business subject to control, without a violation of the due process clause, when the conditions or practices in an industry make "unrestricted competition an inadequate safeguard of the consumer's interest, produce waste harmful to the public, threaten ultimately

336

to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself  *  *  *." *Nebbia v. New York,* 291 *U. S.* 502, 54 *S. Ct.* 505, 514, 78 *L. Ed.* 940 (1934).

*Chapter* 175 of the *Session Laws of* 1935 was an "emergency" measure to combat the evils, in relation to the public health and welfare, attending the payment of prices to milk producers "below the actual cost of production," a condition that made for production of milk unsafe for human consumption. This from the preamble to the act. Again, it is declared in these prefatory findings that "in many instances large sections of the country were actually deprived of a sufficient supply of fresh wholesome milk, and the health of the citizens of this State had been thereby actually threatened because the price being paid to milk producers was below the cost of production." The aim was stated to be the remedy afforded by the laws of several neighboring states which had recognized the danger—*i. e.*, provision for "a reasonable return for the milk producer, so as to insure a sufficient supply of fresh wholesome milk." It was pointed out that New Jersey was "among the first to join in the passage of legislation of this type," and the conditions which had prompted the passage of the act of 1933 "are still present in many parts of our nation and without the support of a control act will immediately become operative in New Jersey." The operation of the statute was limited to two years; but there were continuations on the same principle. *L.* 1937, *c.* 56; *L.* 1939, *c.* 82; and, finally, *L.* 1941, *c.* 274, again an "emergency" act, effective "until such date as the legislature shall determine an emergency no longer exists and an exercise of the police power of the state is no longer necessary and shall terminate its operation."

Section 301 of the act of 1935, empowering the administrative agency "to fix the price at which milk is to be bought or sold," and section 700, authorizing the Board to "ascertain, determine, and fix by investigation and proof, as the emergency permits," the minimum price of milk, were

carried into the act of 1941 as sections 21 and 22, respectively.

Reading the current statute in the light of the organic law and the findings embodied in the preamble, related to the outstanding policy of the earlier enactments, it would seem to be interpretive orthodoxy that the phrase "fix the price" in the enumeration in section 21 of the general powers vested in the administrative agency has reference merely to the power granted by the succeeding section 22, in definite and precise terms, to "fix and refix by investigation and proof, as the emergency permits, the minimum prices" to producers, milk dealers, processors, subdealers and stores, and the consumer, in accordance with the standard therein laid down—*i. e.*, such "as will best insure a sufficient quantity of fresh, pure and wholesome milk to the inhabitants" of the State: this after a public hearing on notice. In brief, minimum price maintenance sufficed to cope with the factors interfering with the normal operation of the economic law of supply and demand. The design was to avert unfair and ruinous competition of vital public concern by a compulsory minimum price scale, and thus to stabilize the industry in the service of the common good.

This assessment of the statutory grant is emphasized and fortified by kindred provisions. Section 29 forbids the distribution, sale or handling of milk, by dealer, processor, subdealer or store, "where the milk has been purchased either directly or indirectly, for a price less than the minimum price fixed" by the Director. Section 30 interdicts a "secret agreement, arrangement, combination, contract or common understanding" whereby the price of milk to be paid to producers in New Jersey is "reduced," or the price to be paid by dealers, processors, subdealers, stores or consumers is "decreased"; and such offenses are declared "to be contrary to the public interest and in restraint of trade and commerce," and the offender is made subject to a specific penalty therein prescribed. And section 49 ordains that the sale of imported milk "at a price lower than that required to be paid for milk produced within the State" shall be a viola-

tion of the act, restrainable by an injunction in equity if the violations be repeated.

There are no comparable statutory sanctions relating to milk sales above the price fixed by the director. There is no such interdiction against sales in excess of prices so established. There is no suggestion whatever of a legislative purpose to control prices because unduly excessive or to guard against the economic disturbance ofttimes attending violent price fluctuation. Indeed, the majority opinion concedes that "the immediate evil in 1933 was price cutting." The preamble to the original act of 1933, c. 169, states that the purpose was to force a "better return" to the producers. And the later acts continued this policy. The declared purpose of the general powers enumerated in section 21 is to provide the measures "necessary" to "control or prevent unfair, unjust, destructive or demoralizing practices which are likely to result in the demoralization of agricultural interest in this State engaged in the production of milk or interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State."

The avowed policy of the statute is fully served by minimum price control. While specific provisions for both maximum and minimum price control would be understandable, is it not incongruous to provide for fixed prices and minimum prices? It would be an awkward and unworkable procedure that would call for minimum prices on an area or market basis, depending on local exigencies, and require maximum prices to have a state-wide operation, not to mention possible constitutional complications.

The existence and the extent of the public need and the nature and quality of the remedial measures are within the exclusive province of the lawgiver; and it is fundamental that these are basic elements which must find expression in clear and indubitable terms. Exposition cannot be the medium of enlarging the legislative grant to conform with the judicial concept of economic, social or governmental policy, or to give effect to some supposed legislative intention. It is of the very nature of the power that the adminis-

trative function be clearly and expressly delineated. It cannot be made to rest upon doubtful or uncertain implication. These are fundamental considerations related to the character and quantum of the power. And where the symbols of expression are of doubtful import, the power is denied. A statute in derogation of the common right is to be strictly construed.

It is to be borne in mind that this is an "emergency" measure to meet a public exigency. The "emergency" has continued for nearly 20 years; and never before was it deemed necessary to set a price ceiling in this industry, leading reasonably to the conclusion that there has been no emergency calling for this measure, and that the Legislature did not at any time have this in mind as a common necessity. The contrary hypothesis suggests legislative acquiescence in an administrative construction excluding the power, a settled meaning alterable only by legislative action. If there be a present-day need for a price ceiling, recourse should be had to the Legislature, whose exclusive province it is to resolve that question in keeping with constitutional requirements.

I would reverse the determination under review, as an excess of jurisdiction.

HEHER, J., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.