93 N.J. Super. 326 (1966)
225 A.2d 728
SUPERMARKETS GENERAL CORPORATION, A CORPORATION OF THE STATE OF DELAWARE, PLAINTIFF, AND SAVE WAY PHARMACY, A CORPORATION OF NEW JERSEY, AND CHERRY HILL SAVEWAY PHARMACY, A CORPORATION OF NEW JERSEY, INTERVENING PLAINTIFFS,
v.
ARTHUR J. SILLS, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AND BOARD OF PHARMACY OF THE STATE OF NEW JERSEY, DEFENDANTS, AND NEW JERSEY PHARMACEUTICAL ASSOCIATION, A NON-PROFIT ASSOCIATION OF THE STATE OF NEW JERSEY, INTERVENING DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided December 8, 1966.
*332 Mr. Charles Danzig for plaintiff (Messrs. Riker, Danzig, Scherer & Brown, attorneys).
Mr. Abraham Brenman for intervening plaintiffs (Messrs. Brenman & Susser, attorneys).
Mr. Richard Newman, Deputy Attorney General, for defendants (Mr. Arthur J. Sills, Attorney General).
Mr. Frederic K. Becker for intervening defendant (Messrs. Wilentz, Goldman & Spitzer, attorneys).
MINTZ, J.S.C.
Plaintiffs seek a declaratory judgment adjudicating unconstitutional L. 1965, c. 120 (N.J.S.A. 45:14-12). Since the institution of this suit the original *333 plaintiff, Supermarkets Operating Company, a corporation of New Jersey, merged with Supermarkets General Corporation, a corporation of the State of Delaware (hereinafter referred to as Supermarkets). The pleadings were amended to reflect this change. The intervening plaintiffs, Save Way Pharmacy and Cherry Hill Saveway Pharmacy (hereinafter collectively referred to as Save Way), ask for the same adjudication.
The statute in question (hereinafter referred to as chapter 120) permits the State Board of Pharmacy (hereinafter referred to as the Board) to refuse an application for examination or suspend or revoke the certificate of a registered pharmacist or a registered assistant pharmacist, upon proof satisfactory to the Board that such pharmacist is guilty of grossly unprofessional conduct. The following is declared by the statute to constitute grossly unprofessional conduct:
"a. Paying rebates or entering into an agreement for payment of rebates to any physician, dentist or other person for the recommending of the services of any person.
b. The providing or causing to be provided to a physician, dentist, veterinarian or other persons authorized to prescribe, prescription blanks or forms bearing the pharmacist's or pharmacy's name, address or other means of identification.
c. The promotion, direct or indirect, by any means, in any form and through any media of the prices for prescription drugs and narcotics or fees or for services relating thereto or any reference to the price of said drugs or prescriptions whether specifically or as a percentile of prevailing prices or by the use of the terms `cut rate,' `discount,' `bargain,' or terms of similar connotation; * * *
d. The claiming of professional superiority in the compounding or filling of prescriptions or in any manner implying professional superiority which may reduce public confidence in the ability, character or integrity of other pharmacists.
e. Fostering the interest of one group of patients at the expense of another which comprises the quality or extent of professional services or facilities made available.
f. The distribution of premiums or rebates of any kind whatever in connection with the sale of drugs and medications provided, however, that trading stamps and similar devices shall not be considered to be rebates for the purposes of this chapter. * * *"
Similar provisions have been adopted either by way of legislation or regulation in many states.
*334 Although plaintiffs challenge the constitutionality of chapter 120 in its entirety, their basic thrust is directed against paragraphs (c) and (f). It is urged that the subject legislation, viewed realistically, is discriminatory and designed to suppress competition by preventing the advertising of prescription drugs at discount prices. It is asserted that there has been no showing that plaintiffs or other merchants similarly situated have operated their pharmaceutical departments in any way deleterious to the public health or welfare. In brief, they allege that the legislation under attack was designed to insulate the neighborhood drug store from the competition of plaintiffs and others.
Plaintiffs contend that chapter 120 is invalid since it bears no relation to the public health, safety and welfare. They urge that it violates the Constitution of the United States as a denial of freedom of speech, the taking of property without due process of law, and the denial of equal protection of law. They further urge that the act is invalid because the Commerce Clause reserves the right to enact such legislation to Congress and that Congress has pre-empted this field of legislation. The statute is also alleged to be void for vagueness. Similarly, invalidation is demanded because of the alleged violation of the Constitution of New Jersey as to freedom of speech, equal protection of the laws, excessive fines and penalties, and violation of the requirement that every law shall embrace but one subject which shall be expressed in its title. Defendants assert that chapter 120 constitutes a valid exercise of the police power of the State, and thus should be adjudicated valid in every respect.
Supermarkets and its affiliates operate a group of stores under the name of "Shop-Rite," and sell a wide variety of products. Several of them contain duly licensed and registered pharmacies which are operated in a separate section of the respective stores or, in one instance, under a separate roof. Plaintiff has advertised extensively in various mediums, particularly through newspapers and circulars. In conjunction with their trade mark "Shop-Rite," Supermarkets has utilized *335 the slogan "Why Pay More." This slogan and the trade mark "Shop-Rite" are displayed on signs prominently placed in the stores and on signs outside of the stores. Their distinctive mark and slogan are on their bags and wrapping materials. The bags used in the pharmacy departments also describe Supermarkets' pharmacies as "prescription specialists." Additionally, Supermarkets has utilized the advertising device of coupons, allowing a purchaser 50¢ off on any purchase made in their prescription departments. However, prior to the enactment of the subject legislation Supermarkets, upon request of the Board, voluntarily discontinued the use of coupons.
Save Way has advertised prescription drugs at a discount and also that it will fill prescriptions at a price cheaper than any other pharmacy.
It is well established that regulations imposed upon legitimate business must not be arbitrary and unreasonable and must be related to the health and general welfare of the public. In New Jersey Used Car Trade Ass'n v. Magee, 1 N.J. Super. 371 (Ch. Div. 1948), the court indicated the general standards for constitutionality of a statute as follows:
"* * * The general rule was succinctly stated by the United States Supreme Court in Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385, thus:
`To justify the State in thus interposing its authority in behalf of the public, it must appear  first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts.'
In N.J. Good Humor, Inc. v. Board of Com'rs of Borough of Bradley Beach, supra [124 N.J.L. 162, 11 A.2d 113], Mr. Justice Heher speaking for the Court of Errors and Appeals said:
`The restraints and regulations imposed for the general good and welfare must needs have the virtue of reasonableness. There *336 cannot be in the name of police regulation, an unreasonable and oppressive curtailment of personal or property rights. * * * And it goes without saying that an exertion of the public power, affecting personal and property rights, is nugatory unless made in good faith for the attainment of a public object within its cognizance. If the dominant purpose be the service of private interests under the cloak of the general public good, it must be adjudged a perversion of the power.'" (at p. 378)
It is equally well established that the burden of a party attacking a statute as unconstitutional is a strong one. An enactment of the New Jersey Legislature is presumed to be valid and to be based upon factual support. As was said in Reingold v. Harper, 6 N.J. 182 (1951):
"Factual support for the legislative judgment is to be presumed. Barring a showing contra, the assumption is that the measure rests upon some rational basis within the knowledge and experience of the Legislature. Metropolitan Casualty Insurance Co. [of New York] v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070 (1935). While the existence of a rational basis for the legislation may be assailed by proof of facts beyond the sphere of judicial notice, `by their very nature such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it'; and where there was a fairly arguable question as to the extent of the need, the decision was for the legislative body and `neither the finding of a court arrived at by weighing the evidence, nor the verdict of a jury can be substituted for it.' * * *" (at p. 196)
Accord, Grand Union Co. v. Sills, 43 N.J. 390 (1964); Fried v. Kervick, 34 N.J. 68, 74 (1961); American Budget Corp. v. Furman, 67 N.J. Super. 134 (Ch. Div. 1961), affirmed 36 N.J. 129 (1961). See generally, Hudson County News Co. v. Sills, 41 N.J. 220, 227 (1963). A legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. Harvey v. Board of Chosen Freeholders of Essex County, 30 N.J. 381, 388 (1959). A trial court should assume a statute constitutional unless it so clearly conflicts with the Constitution as to leave no reasonable doubt of its defectiveness. State v. Cannarozzi, 77 N.J. Super. 236 (App. Div. 1962). It is not the function of this court to sit as a super-legislature or concern itself with the wisdom or policy underlying the statute. Hudson County *337 News Co. v. Sills, supra, at p. 229. Our sole function is to determine whether the Legislature, by its passage of chapter 120, exceeded the broad limits of its constitutional power.
Defendants primarily rely upon Abelson's, Inc. v. New Jersey State Board of Optometrists, 5 N.J. 412 (1950). In that case the court upheld the validity of a statute regulating advertising by optometrists and in the course of its opinion stated:
"Optometry is not a mere trade or craft. * * * [T]he practice of optometry calls for scientific knowledge and skill in the use of refractive media. Want of knowledge of the scientific principles and of the mechanism of accommodation, and loose practice are fraught with such danger to the delicate and vital organ of sight as to warrant strict regulation of the calling in the interest of health and safety; and, to that end, the State may adopt measures to insure technical knowledge and skill and proscribe practices and procedure that may be unexceptionable in the market place but do not comport with the standards of professional behavior commonly accepted today as essential to the practice of the healing art and its kindred pursuits relating to anatomical and physical function. * * *

* * * * * * * *
The public health is a paramount concern of government. Apart from the protection of the individual against incapacity and fraud, the correction of visual deficiencies bears a direct relation to the public safety and our general social and economic well being. The relationship is self-evident. The Legislature is invested with a broad discretion in the choice of means to serve this vital public interest, subject only to constitutional restraints and the rule of reason. If the measures invoked tend to serve a legitimate interest of society, the wisdom of the course taken is not ordinarily a justiciable question. When the subject lies within the police power of the State, `debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment.' * * *
In the regulation of professions of the particular class, the State may ban practices and procedures tending to unseemly competition and the lowering of the standards of service which comport with the nature of the pursuit." (at pp. 418-421, emphasis added)
Similarly, the practice of pharmacy is a profession, 28 C.J.S. Druggists § 1, p. 499, vitally affecting the public health and welfare, and thus is subject to regulation. N.J.S.A. 45:14-7 clearly indicates that the pharmacist must satisfy strict educational requirements before he is entitled to receive his license to practice. That section provides that *338 the applicant shall have been duly graduated or have met all the requirements for graduation from a school or college of pharmacy. Additionally, the applicant for a license must serve one year's apprenticeship and pass a state examination.
The curriculum in a pharmacy college leading to a degree in pharmacy generally includes a five-year course encompassing such subjects as organic chemistry, physics, biochemistry, pharmaceutical analysis, anatomy, physiology, organic medicinals, pharmaceutical microbiology, pharmaceutical technology, pharmacology and dispensing pharmacy. These learning and license requirements entitle the pharmacist to professional status. Indeed, Dr. Dale C. Friend, a member of the Harvard medical faculty, referred to the pharmacist as a member of the "professional health team."
In concluding that pharmacy is a profession, I am not unmindful of the fact that over 90% of the prescriptions dispensed are pre-compounded; that is, the pharmacist's function is to count the tablets called for by the prescription and transfer them from the container furnished by the manufacturer into the bottle ultimately dispensed to the purchaser. As will hereinafter appear, however, the role of the pharmacist goes beyond that of the sale of a commodity. In filling a prescription the pharmacist often aids the physician by informing him of the properties and effects of various drugs. If the prescription calls for a generic compound, he chooses the particular brand to be dispensed. Additionally, he may "monitor" each prescription as to dosage, and possibly determines whether the prescribed drug may be antagonistic to another previously prescribed for the patient by another physician.
Since pharmacy is a profession, the practice of which affects the public health and welfare, the Legislature in the exercise of its police power may enact such legislation as it deems appropriate to safeguard the public interest, and ban practices tending to unseemly competition which lower standards of service. Abelson's, Inc. v. New Jersey State Board of Optometrists, supra.
*339 The extent to which courts will go in upholding legislation enacted under the guise of the police power is evidenced by many decisions. In Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 75 S.Ct. 761, 99 L.Ed. 563 (1955), the court held constitutional an Oklahoma statute which made it unlawful for anyone not an optometrist or ophthalmologist to duplicate or replace into frames, lenses or other optical appliances, except upon written prescriptive authority of a licensed ophthalmologist or optometrist. The court stated:
"The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement. It appears that in many cases the optician can easily supply the new frames or new lenses without reference to the old written prescription. It also appears that many written prescriptions contain no directive data in regard to fitting spectacles to the face. But in some cases the directions contained in the prescription are essential, if the glasses are to be fitted so as to correct the particular defects of vision or alleviate the eye condition. The legislature might have concluded that the frequency of occasions when a prescription is necessary was sufficient to justify this regulation of the fitting of eyeglasses. Likewise, when it is necessary to duplicate a lens, a written prescription may or may not be necessary. But the legislature might have concluded that one was needed often enough to require one in every case. Or the legislature may have concluded that eye examinations were so critical, not only for correction of vision but also for detection of latent ailments or diseases, that every change in frames and every duplication of a lens should be accompanied by a prescription from a medical expert. To be sure, the present law does not require a new examination of the eyes every time the frames are changed or the lenses duplicated. For if the old prescription is on file with the optician, he can go ahead and make the new fitting or duplicate the lenses. But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." (at p. 487, 75 S.Ct., at p. 464)
With the aid of the strong presumption of constitutionality, the New Jersey courts have rejected numerous due process attacks on business regulations. See Grand Union Co. v. Sills, supra; Hudson County News Co. v. Sills, supra; Jones v. *340 Haridor Realty Corp., 37 N.J. 384 (1962); American Budget Corp. v. Furman, supra; Fried v. Kervick, 34 N.J. 68 (1961); Gibraltar Factors Corp. v. Slapo, 23 N.J. 459 (1957); Lionel Corp. v. Grayson-Robinson Stores, 15 N.J. 191 (1954); Abbotts Dairies, Inc. v. Armstrong, 14 N.J. 319 (1954); Family Finance Corp. v. Gaffney, 11 N.J. 565 (1953); Reingold v. Harper, supra.
Similarly, proscription of advertising in various professions has been subject to judicial scrutiny in many instances. The United States Supreme Court upheld such legislation in the leading case of Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935). The court sustained the validity of an Oregon statute prohibiting dentists from advertising the price of their services. See also, Levine v. State Board of Registration & Examination in Dentistry, 121 N.J.L. 193 (Sup. Ct. 1938).
Legislation regulating advertising by dental laboratories has also been sustained. Lasdon v. Hallihan, 377 Ill. 187, 36 N.E.2d 227 (Sup. Ct. 1941); Perlow v. Board of Dental Examiners, 332 Mass. 682, 127 N.E.2d 306 (Mass. Sup. Jud. Ct. 1955). But cf. Amsel v. Brooks, 141 Conn. 288, 106 A.2d 152, 45 A.L.R.2d 1234 (Sup. Ct. Err. 1954). These cases bear particular significance since dental laboratories, like pharmacies, dispense items only upon prescriptions. It may be observed, however, that an opposite result has occurred in the instance of opticians. State v. Ritholz, 263 Minn. 36, 115 N.W.2d 743 (Minn. Sup. Ct. 1962); Ritholz v. City of Detroit, 308 Mich. 258, 13 N.W.2d 283 (Sup. Ct. 1944); State ex rel. Booth v. Beck Jewelry Ent., 220 Ind. 276, 41 N.E.2d 622, 141 A.L.R. 876 (Ind. Sup. Ct. 1942); New Jersey State Board of Optometrists v. S.S. Kresge Co., 113 N.J.L. 287 (Sup. Ct. 1934). But cf. Ullom v. Boehm, 392 Pa. 643, 142 A.2d 19 (Sup. Ct. 1958). See generally, Annotation, 89 A.L.R.2d 901 (1960).
Viewing the totality of the evidence, I find that plaintiff has not rebutted the strong presumption of constitutionality afforded chapter 120. No affirmative proof was *341 presented by plaintiff indicating that the subject statute transcends the limits of the police power. On the contrary, defendants offered testimony from which it might be thought that chapter 120 was properly designed to correct an existing evil.
Though the primary responsibility for drug prescription rests with the physician, the pharmacist plays an ancillary but important role in insuring that the proper drug and dosage are provided. Accordingly, the pharmacist is required to maintain records of all prescriptions. N.J.S.A. 45:14-15. Thus, if the customer frequents one pharmacy for all of his prescription needs, that pharmacist is in a position to check his records and thereby determine if a prescription is in any way antagonistic or contra-indicated by his previous prescription record. The Legislature may have concluded that this important function of pharmacists would be impaired if they were permitted to advertise. The Legislature may have determined that "cut rate," "discount" or promotional advertising in any way would encourage the patient to seek the pharmacy offering the drug at the cheapest price. As a result of "price shopping" the pharmacist presumably would not be in a position to effectively determine, by reference to his prescription records, if a particular drug is antagonistic to one previously prescribed, possibly by another physician.
It was urged that the patient's records are reviewed by the pharmacist only for the purpose of checking prices on prescriptions previously filled for the customer. Perhaps that may be the practice of many pharmacists, but there may be infrequent instances where a pharmacist does "monitor" the prescription for the purpose of possibly detecting the prescription of an antagonistic drug. Infrequent as such occasions may be, they may justify the enactment of chapter 120. See Williamson v. Lee Optical of Oklahoma, supra, 348 U.S., at p. 487, 75 S.Ct. 461.
Plaintiffs argued that no evidence was presented to indicate that a pharmacist who advertises prescription drugs at a discount would in any way have a lesser duty to "monitor" *342 a prescription. True, the duty to "monitor" may still exist, but the ability to do so effectively might be impaired if the customer tended to "shop" for his prescription needs.
In further relating the statute to the protection of the public health and welfare, it may be observed that discount price advertising may encourage smaller retailers to buy unusually large quantities of drugs in order to take advantage of cheaper prices for such purchases, and thus meet the competition of the larger outlets. As a result, otherwise potent drugs may remain on the shelf for an extended period of time, during which they may deteriorate and ultimately be sold to the customer. Dr. Friend testified that little is known about the problems of drug deterioration, but that the situation poses a prime concern in the profession. Hence, if the statute at all deters such buying practices, its relation to the public interest is manifest.
The court is not unmindful of the cogent argument in opposition to the statute. That the field of pharmacy affects the public health and is therefore generally subject to regulation is without question. To this end, however, the Legislature has insured that dangerous drugs are dispensed according to rigid standards. N.J.S.A. 45:14-13 et seq. Also, as already observed, the Legislature has insured the technical competence of pharmacists. N.J.S.A. 45:14-6, 7. Chapter 120, therefore, is the first instance of legislation regulating solely the commercial aspects of the profession.
As indicated by the Supreme Judicial Court of Massachusetts in Milligan v. Board of Registration in Pharmacy, 348 Mass. 491, 204 N.E.2d 504 (1965), when the regulation of pharmacy extends beyond the qualification of pharmacists and the safety of the products, and encompasses the commercial aspects of the profession, serious questions of constitutional validity arise.
The field of pharmacy is an admixture of both professional and commercial functions. The pharmacist, while practicing a profession by compounding drugs and rendering the incidental services to which reference has already been made, also *343 is engaged in a commercial venture requiring merchandising and marketing techniques. This dichotomy has been recognized in other professions, with the result that legislation regulating the commercial aspects thereof has not been sustained. Trinka Services, Inc. v. State Board of Mortuary Science of N.J., 40 N.J. Super. 238 (Law Div. 1956). Cf. New Jersey State Bd. of Optometrists v. S.S. Kresge Co., 113 N.J.L. 287 (E. & A. 1934).
Additionally, though statutory proscription of advertising for professional services has been upheld, it may be observed that the respective courts were concerned with professions which exclusively involved the rendering of a service rather than the vending of commodities. See Semler v. Oregon State Board of Dental Examiners, supra. The various courts sought to foster a personal relationship predicated upon a confidence in the one rendering the service rather than a relationship based upon price. That rationale seems inapplicable to pharmacy. The pharmacist dispenses a commodity the quality of which is strictly regulated by state statutes, N.J.S.A. 24:6-1 and federal legislation, 21 U.S.C.A. § 351 et seq. (Food, Drug & Cosmetic Act). Consequently, the need for a personal rapport between the pharmacist and the customer succumbs to the fact that commodity dispensed is virtually standardized.
Finally, in proscribing advertising in the other professions the various courts were concerned with "bait advertising" having the effect of luring potential patients to the particular doctor, dentist or optometrist. This rationale is inapposite in the instant case since one may obtain drugs and narcotics only upon prescription from a physician.
However, defendants' evidence, to which I have alluded, indicates that the public interest may be served by chapter 120. Such evidence, together with the strong presumption of constitutionality, requires this court to adjudicate chapter 120 as constitutional.
A contrary result was reached by the Florida Supreme Court, which held a similar rule promulgated by the Florida *344 State Board of Pharmacy unconstitutional. Stadnik v. Shell's City, Inc., 140 So.2d 871 (1962). The court there said:
"The rule proceeds on the notion that the advertisement of a prescription drug will subject the physicians to some sort of irresistible pressures that will force them to prescribe drugs for their patients simply on the basis of patient demand and without regard to the physical well-being of the patient. This concept disregards completely the professional and ethical integrity of the medical profession in prescribing remedies for patients. Furthermore, it actually suggests the probability of unethical conduct. In actuality, the rule has more resemblance to an economic regulation prohibiting price competition in the prescription drug business than it does to a regulation guarding the public health."
In Oregon Newspaper Publishers Ass'n v. Peterson, 415 P.2d 21 (1966), the Oregon Supreme Court also declared unconstitutional an administrative regulation of the State Board of Pharmacy prohibiting the public advertisement of prescription drugs. The court concluded that the board's attempt to regulate advertising was beyond the scope of its vested authority, and therefore invalidated the challenged regulation. The rationale in that case does not apply to the instant situation since the court is here concerned with a legislative enactment, as contrasted to an administrative regulation. Significantly, in the course of its opinion the Oregon court observed that "In the interest of public health, the Legislative Assembly presumably could enact statutes concerning the public promotion and advertisement of poisons and dangerous drugs * * *."
Having concluded that chapter 120 is a proper exercise of the police power, it follows that the statute is not an unreasonable interference with interstate commerce. U.S. Const., Art. I, § 8. It is urged that the Legislature has discriminated in favor of out-of-state pharmacies whose sales and advertising within this State are not subject to the same restrictions.
It is axiomatic that if a statute is a proper exercise of the police power and has but an indirect effect on interstate commerce, such statute will not constitute an unconstitutional interference with the Commerce Clause. Prentiss v. *345 National Airlines, 112 F. Supp. 306 (D.C.N.J. 1953); Aerated Products Co. of Philadelphia, Pa. v. Department of Health of State of New Jersey, 59 F. Supp. 652 (D.C.N.J. 1945), affirmed 159 F.2d 851 (3 Cir. 1947); National Dairy Products Corp. v. Hoffman, 40 N.J. 475 (1963); City of Clifton v. Weber, 84 N.J. Super. 333 (App. Div. 1964), affirmed 44 N.J. 266 (1964). The statute must materially affect interstate commerce in order to be deemed unconstitutional. Eli Lilly and Co. v. Sav-on Drugs, Inc., 57 N.J. Super. 291 (Ch. Div. 1959), affirmed 31 N.J. 591 (1960), affirmed 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288, rehearing denied 366 U.S. 978, 81 S.Ct. 1913, 6 L.Ed.2d 1268 (1961).
In an analogous situation the United States Supreme Court, in Head v. New Mexico Board of Examiners, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963), rejected a Commerce Clause argument in upholding a state statute prohibiting optometrists from advertising the price of eyeglasses. The court said:
"A state law may not be struck down on the mere showing that its administration affects interstate commerce in some way. `State regulation based on the police power which does not discriminate against interstate commerce or operate to disrupt its required uniformity may constitutionally stand.'" (at p. 429, 83 S.Ct., at p. 1762)
It is apparent that chapter 120 was not designed to impinge upon interstate commerce in any fashion. The statute is basically a public health measure, and thus any incidental and indirect effect upon interstate commerce (if any) will not serve to emasculate its effectiveness or constitutionality.
Plaintiff also urges that federal legislation has pre-empted state regulation of advertising in the field of food and drugs. The Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., prohibits unfair or deceptive acts or practices in commerce by making it unlawful for any person to disseminate any false advertisement which is likely to induce *346 the purchase of drugs. 15 U.S.C.A. § 52. The evil sought to be cured by the federal legislation is unfair trade practices in the drug business. Chapter 120 is not directed towards such a policy but rather is concerned basically with the protection of the public health. The statutes, therefore, concern different spheres of interest. In finding that the statute here in question is not pre-empted by federal legislation, regard again is given to Head v. New Mexico Board of Examiners, supra, where the court stated:
"In areas of the law not inherently requiring national uniformity, our decisions are clear in requiring that state statutes, otherwise valid, must be upheld unless there is found `such actual conflict between the two schemes of regulation that both cannot stand in the same area, [or] evidence of a congressional design to preempt the field.'" (at p. 430, 83 S.Ct., at p. 1763)
The Federal Trade Commission Act relating to food and drug advertising does not conflict with chapter 120.
Supermarket's contention that the prohibitions upon price dissemination contained in chapter 120 are violative of the First Amendment freedoms of speech and press is also without merit. Such guaranties impose no such restraint upon governmental regulation of purely commercial advertising. United Advertising Corp. v. Borough of Raritan, 11 N.J. 144, 152 (1952); Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
Plaintiffs further urge that chapter 120 violates the state constitutional requirement that every law shall embrace but one subject which shall be expressed in the title. N.J. Const. (1947), Art. IV, § VII.
Chapter 120 is entitled "An Act concerning the professional conduct and practice of pharmacists and ethical standards pertinent thereto, amending sections 45:14-12 and 45:14-33 and supplementing chapter 14 of Title 45 of the Revised Statutes law." The original act is entitled "An Act to regulate the practice of pharmacy in this state." Plaintiff *347 urges that the regulation of advertising is not a concomitant of the "practice of pharmacy." I disagree. Included in the price of the drug is not only the cost of the commodity, but also the professional service rendered in filling the prescription. Thus, when a pharmacist advertises the price of the prescription drug, such advertising necessarily includes the cost of the services in filling the prescription, which services constitute the "practice of pharmacy."
In Howard Savings Institution v. Kielb, 38 N.J. 186 (1962), the court was concerned with the constitutional provision that every law shall embrace but one subject and said:
"The purpose of the constitutional requirement sought to be imposed here as a barrier is to prevent frauds flowing from the use of misleading or deceptive titles. If the title is calculated to give to the Legislature notice of the subject to which the act relates and to the public notice of the kind of legislation under consideration and it can be said that the general subject matter is fairly expressed in the title, then there can be no constitutional objection." (at p. 200)
See also Ahto v. Weaver, 39 N.J. 418, supra. The constitutional standard prescribed for the title of an act does not require that it contain a resume of the provisions of the act. Compliance exists when the title expresses the general purpose and when all the provisions of the legislation appear to be in furtherance of that purpose and appropriate to the end expressed. Wilson v. Long Branch, 27 N.J. 360 (1958); Sorbino v. City of New Brunswick, 43 N.J. Super. 554 (Law Div. 1957). The instant statute meets this test.
Plaintiffs' contention that chapter 120 imposes excessive fines and cruel and unusual punishments, in contravention of N.J. Const. (1947) Art. I, par. 12, is unsustainable. The statute empowers the State Board of Pharmacy to suspend or revoke the certificate of a registered or assistant pharmacist upon satisfactory proof that the pharmacist is guilty of grossly unprofessional conduct as defined therein. Additionally, N.J.S.A. 45:14-37 empowers the Board to assess penalties upon a graduated scale for violation of the various provisions of the statutes regulating pharmacy, beginning at *348 $25. These provisions simply do not provide for excessive penalties.
The power of the Board to suspend or revoke the certificate of a pharmacist upon satisfactory proof of a violation of chapter 120 does not constitute a cruel and unusual punishment. This statute, which is designed to benefit the public health, prescribes a code of ethics governing the professional conduct of the pharmacist. Certainly, if a pharmacist is determined to be guilty of unprofessional conduct, the penalty of suspension or revocation may properly be invoked.
It has been urged that the penalty may be cruel in that an employee pharmacist may suffer suspension or revocation of his license because of the practices of his employer; e.g., an assistant pharmacist may suffer if the pharmacy in which he is employed advertises contrary to the terms of the statute. However, chapter 120 is concerned with the conduct and practice of the individual pharmacist. Thus, if the Board determines that an individual pharmacist has breached the prescribed standards of ethical conduct, the appropriate sanctions may be imposed. Such a result does not constitute a cruel or unusual punishment.
N.J.S.A. 45:14-12 (f) provides, in part, that the pharmacist may be guilty of unprofessional conduct by "[T]he distribution of premiums or rebates of any kind whatever in connection with the sale of drugs and medications provided, however, that trading stamps and similar devices shall not be considered to be rebates for the purposes of this chapter." (Emphasis added) Plaintiffs urge that the statutory distinction between premiums or rebates, such as coupons and trading stamps, is arbitrary and thus violative of the constitutional equal protection requirements.
As already noted, defendants' case was predicated upon the proposition that pharmacy is a profession, and that the State, in the regulation of such profession, may ban practices tending to unseemly competition and the lowering of standards of service. It is difficult to conceive how the issuance of trading stamps as opposed to premiums or rebates *349 furthers such objectives. Dean Linwood Tice of the Philadelphia College of Pharmacy and Science, who testified that pharmacy is a profession, expressed surprise in learning that the statute sanctioned the use of trading stamps. However, the good sense of a statute is not the proper concern of the courts. Two Guys From Harrison, Inc. v. Furman, 32 N.J. 199, 229 (1960). The law need not be in every respect logically consistent with its aims to be constitutional. Williamson v. Lee Optical of Oklahoma, supra. The court must uphold a classification unless it is plainly demonstrated to be capricious. As observed in New Jersey Restaurant Ass'n, Inc. v. Holderman, 24 N.J. 295 (1957):
"The burden of demonstrating that a statute contravenes the equal protection clause is extremely formidable, and is attested by the long trail of failure. In addition to the strong presumption of constitutionality with which all organic challenges are approached, one who assails a statute on this ground must contend with principles of unusual elasticity. It is easily stated that the classification (1) must not be palpably arbitrary or capricious, and (2) must have a rational basis in relation to the specific objective of the legislation. But the second proposition is qualified by limitations which compound the difficulties of one who assails the legislative decision. Thus it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt." (at p. 300)
There is a distinction between premiums or rebates in the form of coupons, and trading stamps. In Sperry and Hutchinson Co. v. Margetts, 15 N.J. 203 (1954), the court determined that trading stamps were not included under a statute which prohibited the granting of rebates in connection with the purchase of gasoline. It was held that trading stamps represented merely a cash discount and not a price adjustment.
Similarly, in the instant case the Legislature, in permitting the use of trading stamps as opposed to rebates or premium devices, apparently was distinguishing between a form of cash discount and what otherwise would comprise premiums or inducements to buy.
*350 It was urged that the statute in its present form would not prohibit a pharmacist from giving "double or triple stamps" on prescription items, thereby frustrating the intent of the Legislature. If, however, a pharmacist issued trading stamps in excess of the normal discount for cash, such practice conceivably would be in violation of the letter and spirit of chapter 120.
I conclude that the quoted provision in paragraph (f) does not contravene the Equal Protection Clauses of both the New Jersey and Federal Constitutions.
Chapter 120 is not void for vagueness. The Legislature has established a standard of behavior which reasonably notifies the pharmacist of what constitutes grossly unprofessional conduct. Certainly, it would not be possible to frame a definition of such conduct which would anticipate every form of offensive activity.
Finally, it is not incumbent upon the court at this time to decide whether Supermarkets' use of the trade name "Shoprite," or their advertising logo "Why Pay More," is violative of chapter 120. The complaint and pretrial order solely present the issue of constitutionality.
Additionally, the Legislature has bestowed upon the Board rather than the courts the discretionary power of determining, in the first instance, whether particular behavior violates the statute. Such a factual determination is a prerequisite to judicial review. Cf. Nolan v. Fitzpatrick, 9 N.J. 477 (1952); Hudson County National Bank v. Provident Inst. for Savings, 80 N.J. Super. 339 (Ch. Div. 1963), affirmed 44 N.J. 282 (1965). The Board of Pharmacy is composed of five members, each of whom is a pharmacist. N.J.S.A. 45:14-1. Certainly these people are equipped to adjudge the conduct of their fellow pharmacists.
An appropriate form of judgment will be submitted, consented to as to form or to be settled on notice.